No. 19-CV-00136-NDF

_____

# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF WYOMING

_____

DENNIS MEYER DANZIK,
*Appellant*,

V.

CWT CANADA II LIMITED PARTNERSHIP, AND
RESOURCE RECOVERY CORPORATION.
*Appellees*.

_____

On Appeal from the United States Bankruptcy Court for the District of Wyoming,
Bankruptcy Case No. 19-20116, the Honorable Cathleen D. Parker, Presiding

_____

## APPELLEES' APPENDIX

MARKUS WILLIAMS YOUNG
& HUNSICKER LLC

By:  Bradley T. Hunsicker
106 East Lincolnway, Suite 300
Cheyenne, WY  82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

*Counsel for CWT Canada II Limited Partnership and Resource Recovery Corporation*

Appellees CWT Canada II Limited Partnership and Resource Recovery Corporation (the "CWT Parties"), by the through their undersigned attorneys, and pursuant to Federal Rule of Bankruptcy Procedure 8018(b)(2), hereby serve and file their Appellees' Appendix.

On September 16, 2019, Appellant Dennis Meyer Danzik ("Danzik") filed Appellant's Opening Brief.  [Doc. 8.]  The Federal Rules of Bankruptcy Procedure provide that "the appellant must serve and file with its principal brief excerpts of the record as an appendix."  Fed. R. Bankr. P. 8018(b)(1).  Danzik did not file an appendix with his Appellant's Opening Brief.  Accordingly, the CWT Parties file this Appellees' Appendix, which is attached hereto, pursuant to Fed. R. Bankr. P. 8018(b)(2), which provides "[t]he appellee may also serve and file with its brief an appendix that contains material required to be included by the appellant or relevant to the appeal or cross-appeal, but omitted by the appellant."

## **TABLE OF CONTENTS**

1.      Motion to Dismiss Chapter 7 Case, with Prejudice.  Pages 1 – 23.

2.      Debtor's Response to the CWT Parties' Motion to Dismiss the Above Described Chapter 7 Proceeding.  Pages 24 – 31.

3.      Reply to Debtor's Response to Motion to Dismiss Chapter 7 Case, with Prejudice.  Pages 32 – 41.

4.      Transcript of Proceedings Held Before the Honorable Cathleen D. Parker, United States Bankruptcy Judge.  Pages 42 – 102.

5.      Minutes of Proceeding.  Page 103.

6.      Decision Memorandum on Motion to Dismiss Chapter 7 Case with Prejudice.  Pages 104 – 117.

7.      Judgment.  Page 118.

Respectfully submitted this 16th day of October, 2019.

MARKUS WILLIAMS YOUNG & HUNSICKER LLC

By:  /s/ Bradley T. Hunsicker
Bradley T. Hunsicker (WY Bar No 7-4579)
106 East Lincolnway Suite 300
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email: bhunsicker@markuswilliams.com

*Counsel for CWT Canada II Limited Partnership and Resource Recovery Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing **APPELLEES' APPENDIX** was served *as indicated* on October 16, 2019, upon the below-named party:

**Via Electronic Notice**
Ken McCartney
bnkrpcyrep@aol.com

/s/ Bradley T. Hunsicker
Bradley T. Hunsicker

Bradley T. Hunsicker (Wyo. Bar 7-4579)
**MARKUS WILLIAMS YOUNG & HUNSICKER LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY  82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

Jeffrey M. Eilender (*pro hac vice to be submitted*)
Bradley J. Nash (*pro hac vice to be submitted*)
Joshua D. Wurtzel (*pro hac vice to be submitted*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, NY 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
jeilender@schlamstone.com
bnash@schlamstone.com
jwurtzel@schlamstone.com

Attorneys for Creditors CWT Canada II Limited Partnership
and Resource Recovery Corporation

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In Re:<br><br>DENNIS MEYER DANZIK,<br>xxx-xx-1786<br><br>Debtor. | Case No. 19-20116<br>Chapter 7 |

---

### MOTION TO DISMISS CHAPTER 7 CASE, WITH PREJUDICE

Creditors CWT Canada II Limited Partnership ("CWT Canada") and Resource Recovery Corporation ("RRC") (the "CWT Parties") submit this *Motion to Dismiss to Dismiss Chapter 7 Case, with Prejudice* (the "Motion") for "cause" under 11 U.S.C. § 707(a) on the basis that Dennis Danzik ("Debtor") filed this case in bad faith, inconsistent with the purpose of Chapter 7, and allowing Debtor to proceed in Chapter 7 renders this Court's repeated decisions on dismissal versus conversion meaningless.

# INTRODUCTION

1.      As this filing shows, Debtor is the poster child for those who abuse our bankruptcy courts to evade, rather than benefit, creditors.  As this Court is painfully aware, this is now Debtor's **third** bankruptcy filing—with this case being filed just **one month** after Debtor's last Chapter 11 case was dismissed and just **four days** after this Court denied Debtor's motion to alter or amend the judgment in that case.  Indeed, after this Court held that Debtor's Chapter 11 case should be dismissed, rather than converted to a Chapter 7, Debtor filed this Chapter 7 anyway—thus helping himself to relief to which this Court held he was not entitled and seeking to render this Court's carefully-reasoned decision meaningless.

2.      Further, as explained below, while this Court held in its order dismissing Debtor's recent Chapter 11 case that Debtor has insufficient assets to meaningfully satisfied **unsecured** creditors—and so Chapter 7 is inappropriate—this conclusion is even **better supported today**, now that the CWT Parties have a nondischargeable $7 million judgment against Debtor.

3.      Thus, this bankruptcy filing is nothing more than a desperate attempt by Debtor to avoid the CWT Parties' judgment against him and to try to run up their costs in the hope that they simply give up.  To some extent, Debtor's plan has worked—since this third filing has now temporarily stayed the CWT Parties' enforcement efforts, and the CWT Parties must now spend more time and money moving to dismiss this **third** bankruptcy.  But this Court should not allow Debtor to use this Court and our country's bankruptcy system as his own personal "pause" button that he can press at any time and

**2**

for any reason.  Thus, as explained below, this Court should dismiss this case immediately, and should bar Debtor from any further bankruptcy filings for 180 days.

## BACKGROUND

4.      On January 4, 2016, Dennis M. Danzik (the "Debtor") filed a voluntary petition in this Court for relief under Chapter 11 of the Bankruptcy Code, Case No. 16-20002 (the "First Case").

5.      While the First Case was pending, the CWT Parties sought judgment against Debtor in New York State Court.  *GEM Holdco LLC, et al., v. Changing World Technologies, L.P., et al.* (Sup. Ct. N.Y. Co.), Index No.: 650841/2013 (the "New York Action").

6.      On June 3, 2016, as a part of the New York Action, the New York court held Debtor in criminal and civil contempt for his violation of court orders.  Specifically, that court held that he (a) deliberately violated an attachment order directing him to return the stolen Tax Credits; and (b) committed a "fraud on the court" by lying under oath, suborning perjury by another witness, and altering documents to hide his theft.  The New York Court held Debtor in contempt and issued a commitment order and arrest warrant for Debtor.

7.      The New York Court found that Debtor is the "epitome of a recalcitrant, contemptuous, and incorrigible litigant," who "lie[d]," "deliberately did not disclose" relevant records, "coerced" a witness into "submitting false affidavits," and "perjured himself before a Canadian bankruptcy court."

8.      On September 7, 2016, the CWT Parties obtained judgment in the amount of $7,033,491.13 against Debtor in the New York Action (the "New York Judgment").

**3**

9.    On March 8, 2017, the Court found "cause" to dismiss the First Case under § 1112(b) based on the following factors: (1) Debtor was unable to effectuate a plan; (2) there was substantial or continuing loss to or diminution of the estate with no reasonable likelihood of rehabilitation; (3) Debtor had failed to meet filing and reporting requirements; (4) Debtor had failed to pay taxes; and, (5) Debtor lacked good faith in filing and administering the case. *See* Order on Sigma Opportunity Fund II, LLC's Motion to Dismiss, *In re Danzik*, Case No. 16-20002, Doc. 393 *passim* (Bankr. D. Wyo. March 8, 2017) (hereinafter "Ruling Dismissing the First Case").  In addition, the Court addressed whether dismissal or conversion was in the best in interest of creditors and concluded that the case should be dismissed, not converted. *Id.* at 19.

10.    On December 6, 2017, Debtor filed a second Chapter 11 bankruptcy petition in this Court, starting Case No. 17-20934 (the "Second Case").   On October 24, 2018, the CWT Parties filed their *Motion to Dismiss* the Second Case, which the Court took under advisement.

11.    On February 6, 2019, the Court found cause to dismiss the Second Case under § 1112(b)(1).  *See* Decision Memorandum on CWT's Motion to Dismiss, *In re Danzik*, Bankr. Case. No. 17-20934, Doc. 201 (Bankr. D. Wyo. February 6, 2019) (hereinafter "Ruling Dismissing the Second Case").  In particular, the Court found that the CWT Parties showed that "Debtor 1) is grossly mismanaging the estate by failing to timely file monthly operating reports, 2) is not able to effectuate a confirmable plan; and 3) filed this case in bad faith." *Id.* at 15.  In finding that Debtor filed the case in bad faith, the Court found that "Debtor is using the breathing space to avoid his financial obligations.  He has

**4**

not argued nor demonstrated he is using it to rehabilitate any business." *Id.* at 10–11.

Further, the Court quoted the Ruling Dismissing the First Case, and concluded that

"Debtor's circumstances have not changed.  The CWT litigation continues, and Creditors'

claims are on hold while Debtor parks in bankruptcy." *Id.* at 12.  In short, the Court

concluded that Debtor had again filed in bad faith and misused bankruptcy protection to

avoid his creditors and stall litigation.  *Id.*

12.     In the Ruling Dismissing the Second Case, the Court again addressed

whether dismissal or conversion was in the best interest of creditors and expressly followed

the reasoning in its Ruling Dismissing the First Case:

> CWT requests dismissal rather than conversion.  Mr. Danzik's exempt assets
> would only be available to the IRS and secured creditors, leaving no assets
> for a trustee to administer.  There is no pending litigation that would benefit
> a Chapter 7 estate.  The court applies the same analysis from Debtor's first
> case:
>
>> It is in the best interest of the estate to dismiss.  Any liquidation
>> would be for the sole benefit of the secured creditors.  A
>> liquidation bankruptcy case is not administered for the benefit
>> of a debtor's secured creditors but for the benefit of its
>> unsecured creditors.
>
> Therefore, it is in the best interest of the estate and creditors that the court
> dismiss the case.

*Id.* at 13–14 (footnotes and internal quotation marks omitted).  The Court dismissed the

Second Case, but it has not been closed, and remains open and pending.

13.     Finally, on February 14, 2019, Debtor filed his *Motion for Alteration or*

*Amendment of an Order of the Court* (the "Motion to Alter") in the Second Case, in which

Debtor asked the Court to alter its judgment and convert the Second Case to Chapter 7

**5**

instead of dismissing it.  On February 27, 2019, the CWT Parties filed their objection to

the Motion to Alter.

14.    On March 8, 2019, the Court denied the Motion to Alter:

> Debtor never argued for conversion to Chapter 7 liquidation proceedings
> instead of dismissal before or during the hearing.  While Debtor repeatedly
> asserted creditors would be better served by proceedings in bankruptcy court
> rather than collection actions in state court, these arguments were brought in
> the context of his attempts to remain within Chapter 11 proceedings.  All
> creditors had notice of CWT's Motion to Dismiss, yet none contested it or
> advocated for conversion to Chapter 7, rather than dismissal.

Order Denying Motion to Alter or Amend Court's Order, *In re Danzik*, Case. No. 17-

20934, Doc. 211 at 2 (Bankr. D. Wyo. March 8, 2019) (hereinafter, "Order Denying Motion

to Alter").

15.    On March 12, 2019, Debtor filed a voluntary Chapter 7 petition, starting the

above-captioned bankruptcy case, No. 19-20116 (the "Third Case," or "this case").

16.    On March 18, 2019, the Court entered judgment in favor of the CWT Parties

on their nondischargeability claim.  *See* Memorandum Decision and Order Granting in Part

and Denying in Part, CWT Parties' Motion for Partial Summary Judgment, Bankr. No. 17-

20934, Adv. No. 18-02007, Doc. 38 at 10 (Bankr. D. Wyo. March 18, 2019) (hereinafter,

"Ruling on Dischargeability").  In the Ruling on Dischargeability, the Court held that the

$7,033,491.13 judgment that the CWT Parties obtained against Debtor in New York State

Court in *GEM Holdco LLC, et al., v. Changing World Technologies, L.P., et al.* is

nondischargeable:

> The New York Court held that Danzik committed fraud, breached his
> obligations pursuant to a constructive trust, and that Danzik stole the CWT
> Parties' funds. Danzik may not re-litigate issues that the New York Court

**6**

already adjudicated.  The Judgment is non-dischargeable as a matter of law
under Sections 523(a)(2) and (a)(6).

*Id.* at 9–10.

## AUTHORITY AND ARGUMENT

17.     The Bankruptcy Code Provides: "The court may dismiss a case under this
chapter only after notice and a hearing and only for cause, including . . . ."  11 U.S.C.
§ 707(a).  "The enumerated grounds for a 'for cause' dismissal are not exhaustive, but
merely illustrative."  *In re Jakovljevic-Ostojic*, 517 B.R. 119, 126 (Bankr. N.D. Ill. 2014)
(internal quotation marks omitted).

18.     Here, there is 'cause' to dismiss under § 707(a).  First, Debtor filed this case
in bad faith and without proper purpose.  Second, because the Court has already ruled that
Debtor's Chapter 11 should be dismissed, not converted to Chapter 7, the doctrine of res
judicata bars Debtor and his creditors from opposing dismissal.  Finally, because Debtor's
conduct is egregious, the dismissal should be with prejudice and bar refiling for 180 days.
The Court should dismiss the case with prejudice.

### I.     Debtor Filed this Case in Bad Faith and Without Proper Purpose

19.     "Although not listed as one of the enumerated factors constituting cause' for
dismissal under § 707(a), most courts have held that evidence of a debtor's 'bad faith' in
filing a Chapter 7 case is cause for dismissal."  *In re McGuire-Pike*, No. 14-13365 ta7,
2015 Bankr. LEXIS 2282, at *8 (Bankr. D.N.M. July 10, 2015).  "To determine whether a
chapter 7 case was filed in bad faith, courts must review the totality of the circumstances."
*Id.* at 9.  "A debtor's pre-petition conduct is relevant to a court's good faith analysis.  This
includes, among other things, the debtor's past bankruptcy filings."  *In re Brown*, 399 B.R.

**7**

162, 169 (Bankr. W.D. Va. 2009) (internal quotation marks and citation omitted) (analyzing whether a debtor's bad faith in filing was "cause" under § 1307(c)).

20.    The Eleventh Circuit has characterized the totality of the circumstances test for bad faith under § 707(a) as follows:

> **The totality-of-the-circumstances inquiry looks for atypical conduct, that falls short of the honest and forthright invocation** of the [Bankruptcy] Code's protections.  In making that determination, bankruptcy courts must, as they so often do, sift the circumstances surrounding [a] claim to see that injustice or unfairness is not done.  Under this inquiry, **bad faith is ultimately evidenced by the debtor's deliberate acts or omissions that constitute a misuse or abuse of the provisions, purpose, or spirit of the Bankruptcy Code**.

*In re Bushyhead*, 525 B.R. 136, 146 (Bankr. N.D. Okla. 2015) (internal quotation marks and citations omitted) (emphasis added) (alterations in original).

21.    In addition, bankruptcy courts have identified sixteen factors that should be considered in the totality-of-the-circumstances analysis:

1. **Whether the debtor's manipulations (if any) had the effect of frustrating one particular creditor;**
2. **The absence of an attempt to pay creditors;**
3. The debtor's failure to make significant lifestyle changes;
4. Whether the debtor has sufficient resources to pay a substantial portion of debts;
5. Whether the debtor inflated expenses to disguise financial well-being;
6. **Whether the debtor is overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors;**
7. Whether the debtor reduced his creditors to a single creditor in the months prior to filing his petition;
8. Whether the debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle;
9. **Whether the debtor filed the case in response to a judgment in pending litigation;**
10. The unfairness of using Chapter 7;
11. Whether the debtor is paying debts to insiders;
12. Whether the debtor transferred assets;

**8**

Case 1:19-cv-00133-NDF Document 1 Filed 03/20/19 Page 12 of 121 Main
Case 2:19-bk-00133-NDF Doc 18 Filed 03/20/19 Entered 03/20/19 Page 9 of 23
Document     Page 9 of 23

13. **Whether the debtor employed a deliberate and persistent pattern of evading a single major creditor;**

14. Whether the debtor failed to make candid and full disclosure;

15. Whether the debts are modest in relation to assets and income; and

16. **Whether there are multiple bankruptcy filings or other procedural 'gymnastics.'**

*In re McGuire-Pike*, No. 14-13365 ta7, 2015 Bankr. LEXIS 2282, at *9 (Bankr. D.N.M.

July 10, 2015) (emphasis added); *see also In re Baird*, 456 B.R. 112, 116 (Bankr. M.D.

Fla. 2010) (characterizing the ninth factor as whether "the debtor filed the case in response

to a judgment, pending litigation, or collection action"). The circumstances of each debtor

are unique, and the proper weight given to each fact necessarily depends on all of the other

facts presented." *In re Kane & Kane*, 406 B.R. 163, 167 (Bankr. S.D. Fla. 2009). "The

determination of whether cause exists to dismiss a case under section 707(a) lies within the

sound discretion of the bankruptcy court." *In re Jakovljevic-Ostojic*, 517 B.R. 119, 126

(Bankr. N.D. Ill. 2014).

### a. The 16 Factors Show that Debtor filed in Bad Faith

22.     Here, the Court is familiar with Debtor's actions and litigation tactics in this

and other jurisdictions, both inside and outside of bankruptcy. Debtor's conduct in these

cases, and his efforts to thwart the CWT Parties' collection actions, indisputably meet the

six bolded factors in the quotation above and show that he filed this case in bad faith.

23.     First, Debtor's manipulations, in this court and others, have frustrated the

CWT Parties efforts to collect their judgment. Indeed, in his motion to alter or amend,

Debtor admitted that the purpose of a Chapter 7 filing would be to prevent the CWT Parties

from garnishing funds he (erroneously) believes should be used to pay other creditors.

24.    Second, outside of bankruptcy Debtor has made no effort to pay creditors, and even over the course of two lengthy Chapter 11 cases, Debtor made no effort to pay creditors or even formulate and propose—much less confirm—a plan.  Indeed, Debtor has mounted multiple, frivolous collateral attacks on the CWT Parties' New York judgment in multiple jurisdictions in an effort to avoid paying this judgment and run up the CWT Parties' costs in the hope that they stop pursuing him.  All these efforts have failed, including his most recent unsuccessful motion to vacate in New York.  And this Court has now held that this judgment is nondischargeable.  Thus, as with his Chapter 11 case, Debtor is using the protection of our bankruptcy system as a final, desperate attempt to avoid a judgment that multiple courts across the country have refused to undo.

25.    Third, as explained above, given that this is Debtor's third bankruptcy since 2016, and that Debtor made no effort to pay creditors, Debtor is certainty "overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors."

26.    Fourth, Debtor filed this Chapter 7 "in response to . . . a collection action," *In re Baird*, 456 B.R. at 116, namely, the CWT Parties commenced post-judgment collection activities after the Court dismissed his Second Case.  It is prejudicial to the CWT Parties to now, for the third time, be forced to cease collection efforts on their judgment the very moment they begin enforcement action, further evidencing the third factor. Debtor's filing this case simply to reimpose the automatic stay and thwart the CWT Parties' collection action shows bad faith and is cause, standing alone, to warrant dismissal:

> There is no question that the debtor filed his second petition to reinvoke the automatic stay and frustrate foreclosure by Chase.  The debtor's sole intention was to thwart Chase's exercise of its rights under state law.  This

**10**

conduct was inequitable with respect to Chase. The debtor manipulated the Bankruptcy Code and materially hindered the administration of the Confirmed Case by attempting to reinvoke the automatic stay where this Court granted Chase relief therefrom in another pending case.

*In re Brown*, 399 B.R. 162, 170 (Bankr. W.D. Va. 2009). Likewise, Debtor filed this case after the CWT Parties obtained relief through dismissal (again) and diligently began exercising its rights under state law. The fourth factor shows that Debtor filed this case in bad faith and is 'cause' to dismiss the case under § 707(a).

27. Fifth, Debtor has indisputably "employed a deliberate and persistent pattern of evading" the CWT Parties' efforts to collect their judgment against him.

28. And sixth, Debtor has "multiple bankruptcy filings" and has engaged in "procedural 'gymnastics'" to avoid the CWT Parties. As explained above, Debtor has filed in multiple jurisdictions under various entities, used his own bankruptcy or the bankruptcy of another entity to avoid or stall actions against himself or other entities, and has repeatedly sought reconsideration of this and other courts' adverse orders, or in the case of the New York court, simply ignored them.

29. These facts all show that Debtor filed this case in bad faith. The Court should dismiss this case under § 707(a).

> **b. Debtor's Purpose and Motive in Filing the Case are Inconsistent with the Purpose of Chapter 7 - To Pay Creditors and Provide Debtor with a 'Fresh Start'**

30. The unique facts and circumstances of this filing, not captured by the 16 factors quoted above, also show that Debtor's purpose and motive in filing this case are inconsistent with the purpose of Chapter 7, which is to pay creditors and give debtors a

**11**

fresh start.  Indeed, Debtor has few, if any, assets available to pay unsecured creditors.  And
Debtor now owes a $7 million **nondischargeable** debt to the CWT Parties.  So, given
Debtor's lack of assets, Debtor will not obtain a fresh start.  Finally, Debtor filed this case
as an end-run around the Court's prior decisions.  The Court should thus dismiss the case.

31.     First, Debtor cannot fulfil the purposes of Chapter 7 because Debtor has few,
if any, assets to pay unsecured creditors.  Debtor's claim that his creditors will be better
off—or treated more fairly—in Chapter 7 is erroneous.  The Court has already noted that
there are no real assets to pay unsecured creditors this case: "There were little to no funds
to pay unsecured creditors' debt amassing in the millions based upon the evidence
presented."  Order Denying Motion to Alter at 3.  And, as the Court held in its Ruling
Dismissing the Second Case, a "liquidation bankruptcy case is **not administered for the
benefit of a debtor's secured creditors but for the benefit of its unsecured creditors.**"

32.     The CWT Parties are the only unsecured creditors that have been pursuing
Debtor.  The fact that the CWT Parties restrained some of Debtor's assets after his Chapter
11 case was dismissed does not make Chapter 7 any more appropriate.  Indeed, the CWT
Parties are entitled to seek recovery of their stolen tax credits and the proceeds of those
stolen tax credits (e.g., money Debtor earned through the use of these stolen tax credits).
And if these restrained assets genuinely belong to Debtor (which the CWT Parties dispute
on the basis that the funds are, at a minimum, proceeds of the stolen tax credits), then the
IRS or other secured creditors can assert their rights outside of bankruptcy.

33.     Further, Debtor does not dispute that this bankruptcy is intended to *prevent*
the CWT Parties from enforcing their judgment against Debtor.  Debtor's assertion that he

**12**

filed this case to pay creditors, when the Court has already found that he has no assets to do so, shows that Debtor did not file this Chapter 7 so that he can pay creditors but to delay the CWT Parties' collection efforts.  This is an improper purpose and the Court should dismiss the case.

34.    Second, Debtor cannot fulfil the purposes of Chapter 7 because Debtor cannot obtain a 'fresh start.'  Debtor's $7 million debt to the CWT Parties is nondischargeable.  *See In re Bilzerian*, 258 B.R. 850, 858 (Bankr. M.D. Fla. 2001) (debtor's "inability to discharge virtually any significant debt" is "cause" to dismiss the case under § 707(a)). As a result, given the absence of estate assets, the $7 million claim will remain almost totally unpaid.  Debtor will not receive a fresh start through this bankruptcy.  Bankruptcy courts have made clear that, where the purpose of Chapter 7 is thwarted because a debtor will not receive a fresh start, the case should be dismissed because it serves no purpose other than delay.  *See In re Barry*, 19 Fla. L. Weekly Fed. B 108 (U.S. Bankr. N.D. Fla 2005) ("Since almost all of the debts listed in this bankruptcy are excepted from discharge and there are no assets to be distributed to creditors, the question becomes what useful purpose will be served by the continuation of this case. The answer to that question is none.").

35.    The Court should examine the motive and purpose of the Chapter 7, in particular whether Debtor filed the case to achieve a 'fresh start,' in deciding whether the case should be dismissed under § 707(a):

> This requires an analysis of all of the facts and circumstances leading up to the filing of this case to include the debtor's motive in filing the case, the purposes which will be achieved in this case, and whether the debtor's motive

**13**

and purposes are consistent with the purpose of chapter 7, that is, to provide an honest debtor with a fresh start in exchange for the debtor's handing over to a trustee all of the debtor's non-exempt assets for liquidation for the benefit of the debtor's creditors.

This analysis starts with the fact that of the approximately $ 139,762,828.17 of debt listed in [Debtor's] schedules, $ 130,650,328.17 is owed on account of the nondischargeable debts owed . . . . Another $ 9 million is owed to the Internal Revenue Service which, subject to certain narrow exceptions, would be nondischargeable under Bankruptcy Code § 523(a)(1). It can reasonably be inferred from these facts that Bilzerian did not file this case to get a 'fresh start.'

*In re Bilzerian*, 258 B.R. 850, 857 (Bankr. M.D. Fla. 2001) (citations omitted).

36.     Here, Debtor filed this Chapter 7—his third bankruptcy in three years—even though he cannot pay creditors and cannot achieve a fresh start.  Even if a chapter 7 trustee were to generate some assets to pay creditors, Debtor would remain without the 'fresh start' contemplated by Chapter 7.  Thus, Debtor cannot achieve the proper purpose of Chapter 7 and the case should be dismissed.  Continuation of this case will result only in more delay and increased administrative costs.  The Court should dismiss the case.

37.     Finally, Debtor filed this case as an improper end-run around this Court's rulings that Debtor belonged outside of bankruptcy, not in Chapter 7.  The Court ruled in its Ruling Dismissing the First Case that "[i]t is in the best interest of the estate to dismiss." Ruling Dismissing the First Case at 19.  The Court adopted this analysis in its Ruling Dismissing the Second Case: "The court applies the same analysis from Debtor's first case . . . . it is in the best interest of the estate and creditors that the court dismiss the case." Ruling Dismissing the Second Case at 13–14.  When Debtor asked the Court to reconsider this ruling and convert the case instead, the Court rejected his argument and maintained

that dismissal, not conversion, was appropriate.  *See* Order Denying Motion to Alter at 3.

Four days later, and before his Chapter 11 case is closed, Debtor files this case.  Allowing

Debtor to continue in Chapter 7 just days after this Court held that his Chapter 7 should be

dismissed and not converted to Chapter 7 renders this Court's decisions on this issue

meaningless.  In filing this case, Debtor disregarded this Court's repeated rulings and

reasoning that dismissal—not conversion—was in creditors' best interest.  This is further

evidence of Debtor's improper purpose.

38.     Because Debtor filed this case in bad faith and cannot fulfil the purposes of

Chapter 7, the Court should dismiss this case for cause under § 707(a).  Based on the

authority and reasoning set out in Part III, the CWT Parties ask the Court that the dismissal

be with prejudice, barring Debtor from filing in this or any other jurisdiction for 180 days.

## II.     Debtor and His Other Creditors Are Barred by Res Judicata From Opposing Dismissal

39.     The Court should also dismiss the case under the doctrine of res judicata.  In

its Ruling Dismissing the Second Case, the Court rejected the argument that Debtor's case

should be converted from a Chapter 11 to a Chapter 7, and instead held that "[i]t is in the

best interest of the estate to dismiss."  Ruling Dismissing the Second Case at 14.  Because

Debtor and creditors had the opportunity to oppose dismissal or urge conversion of the

Second Case but did not do so, the doctrine of res judicata should now bar them from

opposing dismissal of this case.  The Court should dismiss the case with prejudice.

40.     "'Under res judicata, or claim preclusion, a final judgment on the merits of

an action precludes the parties or their privies from relitigating issues that were or could

**15**

have been raised in the prior action.'" *Hawg Tools, LLC v. Newsco Int'l Energy Servs., Inc.*, 2018 WL 6653354, at *6 (10th Cir. Dec. 18, 2018) (citation omitted).

41.     Here, the Court entered a final judgment dismissing Debtor's second Chapter 11 case.  This dismissal was on the merits.  Debtor and all of his creditors had notice of the CWT Parties' motion to dismiss, and could have thus argued in favor of conversion to Chapter 7 instead of dismissal.  They did not do so.  As the Court noted in its Order Denying Motion to Alter, "Debtor never argued for conversion to Chapter 7 liquidation proceedings instead of dismissal before or during the hearing," and "[a]ll creditors had notice of CWT's Motion to Dismiss, yet none contested it or advocated for conversion to Chapter 7, rather than dismissal."  Order Denying Motion to Alter at 2.  Nor did any of Debtor's creditors join in Debtor's motion to alter or amend the judgment to allow for conversion to a Chapter 7 instead of dismissal.  Because Debtor and creditors had the opportunity to urge any positions to the Court as to why Debtor should be in Chapter 7, but did not take this opportunity, the Court's decision should have preclusive effect and bar such arguments now.

42.     Accordingly, Debtor and all of his creditors are now precluded from arguing that Debtor should be allowed to remain in Chapter 7.  *See In re Reynolds*, 2010 WL 4260026, at *2 (Bankr. D. Mass. Oct. 25, 2010) (res judicata precluded debtors' argument against conversion from chapter 11 to chapter 7 when debtors "could have *but did not*" make this argument when conversion order issued), *aff'd*, 455 B.R. 312 (D. Mass. 2011). The Court should reject any and all arguments about why Debtor should remain in Chapter 7 on this basis and dismiss the case with prejudice.

### III.    The Court Should Dismiss the Case with Prejudice and Bar Debtor from Filing for 180 Days

43.    If the Court dismisses the case, the dismissal should be with prejudice to and

a bar to refiling bankruptcy in any jurisdiction for 180 days. Bankruptcy Code Section

349(a) provides:

> **Unless the court, for cause**, orders otherwise, the dismissal of a case under
> this title does not bar the discharge, in a later case under this title, of debts
> that were dischargeable in the case dismissed; **nor does the dismissal of a
> case under this title prejudice the debtor with regard to the filing of a
> subsequent petition under this title**, except as provided in section 109(g)
> of this title.

11 U.S.C. § 349(a) (emphasis added).

44.    Section 109(g) provides:

> [N]o individual or family farmer may be a debtor under this title who has
> been a debtor in a case pending under this title at any time in the preceding
> 180 days if—
>
> (1)  the case was dismissed by the court for willful failure of the debtor to
>      abide by orders of the court, or to appear before the court in proper
>      prosecution of the case; or
>
> (2)  the debtor requested and obtained the voluntary dismissal of the case
>      following the filing of a request for relief from the automatic stay
>      provided by section 362 of this title.

11 U.S.C. § 109(g).

45.    "In *In re Norton*, a bankruptcy court sitting in Utah made an exhaustive

examination of the factors to be considered in applying § 349(a) and finding the requisite

cause to make a dismissal order with prejudice." *Laine v. Gregory-Laine* (*In re Laine*),

383 B.R. 166, 176 (Bankr. D. Kan. 2008).  In *Norton*, the Court noted that "very little case

law exists in the Tenth Circuit defining and developing the § 349(a) dismissal with

**17**

prejudice provision, or further defining what constitutes 'cause' for dismissal under § 349(a)." *Id.* at 674.

46.    The Court began by noting the difference between § 109(g) and § 349(a). Section 109(g) was enacted "to stop the filing of meritless petitions in rapid succession to improperly obtain the benefit of the Bankruptcy Code's automatic stay provisions as a means of avoiding foreclosure." *Id.* at 680 (internal quotation marks omitted) (quoting *Colonial Auto Ctr. v. Tomlin* (*In re Tomlin*), 105 F.3d 933, 937 (4th Cir. 1997)). Section 349(a), on the other hand, was for circumstances "when a debtor's conduct is more egregious." *Id.*

47.    Such egregious conduct showing "cause" to bar future filing under § 349(a) is determined by two factors "whether (1) the debtor demonstrated bad faith or defiance, and (2) whether the debtor's conduct was abusive or prejudicial to creditors." *Id.* at 681. Other Bankruptcy Courts in the 10th Circuit have used these factors in applying § 349(a). *See, e.g.*, *In re Guebert*, No. 07-41165, 2008 Bankr. LEXIS 1093, at *24 (Bankr. D. Kan. Apr. 11, 2008) ("As to the legal standards for dismissal with prejudice, in the Tenth Circuit two factors must coexist: (1) Bad faith or defiance; and (2) conduct which was abusive or prejudicial to creditors."). The *Norton* explained these factors as follows.

48.    In assessing "whether the debtor demonstrated bad faith or defiance":

Some courts have referred to this conduct as "contumacious" or a "pattern of evasion." This Court also chooses to label this conduct as defiant. The word "defiant" is defined as "bold resistance to an opposing force or authority." Although successive filings do not necessarily constitute defiant conduct, multiple filings may be evidence of such conduct, as is a debtor's continued failure to actively prosecute her bankruptcy cases.

*In re Norton*, 319 B.R. 671, 682–83 (Bankr. D. Utah 2005)

49.    In assessing "whether the debtor's conduct was abusive or prejudicial to creditors":

> A creditor is prejudiced when a debtor, through repeated filings, denies the creditor the opportunity to exercise its contractual rights because of the automatic stay. Abusive serial filing not only denies the creditor certain rights, it allows a "rapacious" debtor to use the automatic stay as a sword against its creditor: this is not the purpose of § 362.

*Id.* at 683–84.   This language and analysis have been quoted and followed by other Bankruptcy Courts in the 10th Circuit.   *See, e.g.*, *In re Hancock*, No. 15-10037-JDL, 2015 Bankr. LEXIS 874, at *17–19 (Bankr. W.D. Okla. Mar. 19, 2015); *In re Guebert*, 2008 Bankr. LEXIS 1093, at *25–27.

50.    Here, the background recounted above shows that Debtor has engaged in defiant and dishonest conduct and misused bankruptcy protection to avoid creditors, stall adverse litigation, and delay the consequences of his actions.   Debtors actions in and out of bankruptcy show a "pattern of evasion" and defiant conduct that is abusive or prejudicial to creditors.   This case is only the most recent example of such conduct.   The Court should bar Debtor from filing for 180 days.

51.    First, Debtor's egregious conduct demonstrates bad faith and defiance.   In the New York Action, the Court held that Debtor (a) deliberately violated an attachment order directing him to return the stolen Tax Credits; and (b) committed a "fraud on the court" by lying under oath, suborning perjury by another witness, and altering documents to hide his theft.   It also characterized Debtor as the "epitome of a recalcitrant, contemptuous, and incorrigible litigant," who "lie[d]," "deliberately did not disclose"

relevant records, "coerced" a witness into "submitting false affidavits," and "perjured himself before a Canadian bankruptcy court."

52.    In this Court, (1) Debtor was unable to effectuate a plan; (2) there was substantial or continuing loss to or diminution of the estate with no reasonable likelihood of rehabilitation; (3) Debtor had failed to meet filing and reporting requirements; (4) Debtor had failed to pay taxes; and, (5) Debtor lacked good faith in filing and administering the case.  Nevertheless, even though there had been no change in circumstances, Debtor filed a second case.  This Court ended up dismissing the Second Case for largely the same reasons as the first.  Debtor's multiple filings are further evidence of his defiant conduct. *Id.* at 683.  Finally, Debtor, like the chapter 13 debtor in *Norton*, "never made an effort to prosecute a plan in good faith, nor has there been any demonstrable change in her circumstances which might justify successive refiling." *Id.*

53.    Nearly the entire background of this case, recounted above, falls under this first factor.  Debtor's conduct exemplifies willful disregard of the legal system and misuse of the bankruptcy system.  Debtor has shown no hesitation about repeatedly filing bankruptcy cases in this and another jurisdiction to avoid his creditors and without any intention of following through on those cases.  The Court should bar Debtor from filing any bankruptcy case in any jurisdiction for 180 days.  Indeed, this is exactly what the Bankruptcy Court for the District of Arizona did in response to the Chapter 11 case brought by RDX Technologies Corporation—the corporation Danzik used to steal the CWT Parties' tax credits—which similarly could not confirm a plan (despite its efforts, unlike Debtor here) and used the bankruptcy process solely as a bad-faith effort to avoid the CWT

**20**

Parties' enforcement efforts. *See In re RDX Techs. Corp.*, Case No. 2:17-bk-14387-PS

(Bankr. D. Ariz.) (Nov. 28, 2018 Order).

54.     Second, Debtor's conduct was abusive or prejudicial to creditors.  Debtor

enjoyed bankruptcy protection for over a total of two years during his bankruptcy cases

before this Court without prosecuting a plan of reorganization.  In fact, Debtor has admitted

to "wisely" using bankruptcy protection to stop collection actions against him.  Response

to Motion to Dismiss, *In re Danzik*, Bankr. Case. No. 17-20934, Doc. 184 at 5 (Bankr. D.

Wyo. November 13, 2018) ("The Debtor has wisely used the protection of the automatic

stay in this case as well as the successor chapter 11 to get his income situation well

grounded, free of disruptive compulsory process, to advance his--and others—defensive,

legal claims . . . .").] And Debtor characterizes his failure to submit a Chapter 11 plan as

"opt[ing], for now to forego the confirmation process." *Id.* at 4.  The Court, in dismissing

the second case, found that "Debtor is using the breathing space to avoid his financial

obligations" and that "Creditors' claims are on hold while Debtor parks in bankruptcy."

These statements, and the Courts' own findings about Debtor's conduct, shows that

Debtor's bankruptcy filings have been solely for the purpose of avoiding his creditors

without any intention of paying his creditors.  Thus, his conduct has been abusive or

prejudicial to creditors.  *In re Norton*, 319 B.R. at 684 ("The failure to file a plan and the

timing of each filing demonstrates that this Debtor has not attempted to adjust and repay

her debts as Chapter 13 contemplates.  Rather, it demonstrates that she has abused the

purposes of the automatic stay . . . her 'sole purpose has been to frustrate and delay her

creditors.'"").  The Court should again find that Debtor's purpose in filing these cases has been to frustrate creditors and avoid his obligations.

55.     Because Debtor's conduct is egregious, demonstrates bad faith and defiance, and continues to be abusive or prejudicial to creditors, the Court should bar Debtor from filing for 180 days.  *See In re Sinischo*, 561 B.R. 176, 194 (Bankr. D. Colo. 2016) ("The Tenth Circuit, in *Frieouf v. United States* (*In re Frieouf*), 938 F.2d 1099, 1103-04 (10th Cir. 1991), held that under § 109(g), courts in this Circuit can bar a debtor from re-filing a petition for a maximum of 180 days."); *but see In re Norton*, 319 B.R. 671, 674 (Bankr. D. Utah 2005) ("[A] majority of courts have . . . affirmed lower courts' decisions that bar future access to the court beyond the § 109(g) 180-day limit.").

56.     Like the debtor in *Norton*, "[t]his Debtor has systematically manipulated the bankruptcy system and used it as her own personal shield from creditors' collection efforts."  *In re Norton*, 319 B.R. at 684.  The Court should follow *Norton* and make clear that "such abusive conduct cannot be condoned and will not be tolerated."  *Id.*  The Court should dismiss the case with prejudice.

## CONCLUSION

**WHEREFORE**, the CWT Parties ask the Court to dismiss this case with prejudice.

**FURTHER**, the CWT Parties ask the Court to bar Dennis Danzik from filing any bankruptcy case in any jurisdiction for 180 days.

Dated: Cheyenne, Wyoming
March 20, 2019

Respectfully submitted,

**CWT Canada II Limited Partnership and**

Resource Recovery Corporation, *Creditors and Movants*

By: */s/ Bradley T. Hunsicker*
Bradley T. Hunsicker, #7-4579
**Markus Williams Young & Hunsicker LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY 82001
Telephone: (307) 778-8178
Facsimile: (307) 638-1975
E-Mail: bhunsicker@markuswilliams.com

*Attorneys for Creditors CWT Canada II Limited Partnership and Resource Recovery Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on March 20, 2019 *electronically,* via the Court's CM/ECF system upon the following parties who have entered their appearance in the above-captioned matter.

**Ken McCartney**
The Law Offices of Ken McCartney, P.C.
P.O. Box 1364
Cheyenne, WY 82003
bnkrpcyrep@aol.com
*Attorney for Debtor*

*/s/ Bradley T. Hunsicker*
Bradley T. Hunsicker

**23**

KEN McCARTNEY, Bar No. 5-1335
The Law Offices of Ken McCartney, P.C.
Post Office Box 1364
Cheyenne, WY 82003
Tel (307) 635-0555
Email: bnkrpcyrep@aol.com

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF WYOMING

In re:                              )
      DENNIS MEYER DANZIK,        )
                              )     Case No.  19-20116
                              )     CHAPTER 7
                Debtor.     )

## DEBTOR'S RESPONSE TO THE CWT PARTIES' MOTION TO DISMISS THE ABOVE DESCRIBED CHAPTER 7 PROCEEDING

COMES NOW the Debtor above named, by counsel, Ken McCartney of

The Law Offices of Ken McCartney, P.C., and he responds to the CWT Parties'

Motion to Dismiss with Prejudice as follows:

1.     The present case was commenced on March 12th, 2019, by voluntary

petition.

2.     The Motion to Dismiss in question is brought pursuant to 11 U.S.C. §

707(a) alleging that the enumerated grounds for dismissal are not exhaustive,

but merely illustrative.  The movant suggests that here there is "cause" to

dismiss because 1) the case was filed in bad faith, and 2) filing should be

barred by *res judicata.*

Page 1 of 8

**24**

## BAD FAITH --ARGUMENT

First of all the Debtor denies this chapter 7 case was brought in bad faith. There is nothing about desiring an orderly Chapter 7 liquidation of substantial assets that constitutes bad faith.  The opposite might be true, but not relevant.

The debtor is looking forward to the evidentiary hearing on this motion which will allow him to thoroughly address issues of bad faith in the related cases.

Next, the 16 factors courts consider when deciding if a chapter 13 should be dismissed for the lack of good faith pursuant to 11 U.S.C. §1325(a)(3) can be reviewed but provide very little guidance given a chapter 7 Debtor's minimal interaction with creditors over time and essentially no control of accumulation and distribution of the estate.

The movant suggests that the Debtor cannot fulfill the "purpose of chapter 7," therefore, this case is filed in bad faith.  He defines "purpose" as obtaining a fresh start.  A fresh start is a relative concept.  This Debtor will benefit from a discharge.  But one has to ask where the "purpose of chapter 7" reaches out and grabs a definition based solely on fresh anything.  Among the many purposes for chapter 7 relief, includes the desire to have an orderly distribution of assets without one opportunistic creditor grabbing the whole apple cart.  That purpose will be fulfilled if this chapter 7 goes forward.

The supporting material accompanying the motion is short on 10th Circuit law.  Perhaps the reason for that is a directly in point Colorado District holding

finding that §707(a) does not encompass good faith requirements.as a matter of

law.  *In re Etcheverry*, 221 B.R. 524, 526 (Bankr.D. Colo 1998).  "This Court

holds that there is not a "good faith" requirement contained in 11 U.S. C. §707(a)"

Considering the lower Court's holding described immediately above, the

Colorado District Court, Judge Wiley Y. Daniel at 242 B.R. 503,   *Shangraw v.*

*Etcheverry*, (Colo. Dist. Ct Dec. 22, 199) takes apart "good faith" chapter 7

dismissal.  Counsel will quote extensively:

"As a preliminary matter, it is important to note that commentators have

questioned the ability of a bankruptcy court to dismiss a Chapter 7 case for lack of

good faith.  See Katie thein Kimlinger & William P. Wassweiler, The Good Faith

Fable of 11 U.S.C. §707(a): How Bankruptcy Courts Have Invented A Good Faith

Filing Requirement for Chapter 7 Debtors, 13 Bankr. Dev. J. 61 (199); see also, 6

Collier on Bankruptcy P707.32[2] ("The power to dismiss a chapter 7 case for lack

of good faith, *if it exists at all* is extremely limited.")  (emphasis added).  While

the Bankruptcy Code explicitly imposes a good faith requirement in the proposal

of Chapter 11, 12 and 13 plans, see U.S.C. §§1129(a), 1225(a)(3), 1325(a)(3)

(1999), no such mandate is articulated under Chapter 7.  Section 707(a) of the

Bankruptcy Code provides that a bankruptcy court

May dismiss a case under this chapter only after notice and a hearing and
only for cause, including—

(1) unreasonable delay by the debtor this is prejudicial to creditors;

(2) nonpayment of any fees or charges required under chapter 123 of title 26; and

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional times as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States Trustee

The instances of "cause" set forth in Section 707(a) are merely illustrative and are not an exhaustive listing. *In re Hammonds*, 139 B.R. 535 (Bankr. D. Colo. 1992)."

The court goes on to recognize that a number of bankruptcy cases have found that the lack of good faith is a valid cause of dismissal under §707(a) citing several at page 504 including several in the Movants brief, i.e. *In re Zick* 931 F. 2d 11244, 1126-27 (6th Cir. 1991).

But Judge Daniel goes on:

"In 1978 Congress enacted a new Bankruptcy Code.  The Code did not contain any express requirement that bankruptcy petitions filed, be filed in good faith.  It, however, did retain the concept that where a Debtor chooses to maintain its relationship with its creditors in an attempt to reorganize, the Debtor must demonstrate good faith in that relationship See 11 U.S.C. §§1129(a)3(3), 1225(a)(3),1325(a)(3).  (1999)  The foregoing provisions contain identical language mandating that the court, prior to confirming a Chapter 11, 12, or 13 plan, must find that the reorganization proposal has been made in good faith. [Judge Daniel] finds that the absence of this language in the Bankruptcy Code's

liquidation chapter, chapter 7, means that Congress did not incorporate a good faith requirement when a bankruptcy court rules on motions to dismiss under 11 U.S.C. §707(a).

Further support for this result comes from changes not made by Congress when it amended the Bankruptcy Code in 1986. It declined to insert a good faith requirement into §707(a) when it changed §707(b). Also in 1986 Coode changes strengthened the ability of United States Trustees to initiate action under §707(b) where there existed substantial abuse. Judge Daniel agrees the with bankruptcy judge in *Etcheverry* that "if Congress had wanted a 'substantial abuse' provision in 707(a) they could have inserted it as they did in §707(b), but they did not do so" *In re Etcheverry*, 221, B.R. at 525.

The exclusion of good faith language in 11 U.S.C. §707(a) makes good sense if one examines the relationship of the Debtor and creditor in a liquidation case. When a Debtor liquidates, it surrenders all of its nonexempt assets for distribution among its creditors, and the debtor-creditor relationship is presumably terminated. Since liquidation requires no ongoing relationship between the Debtor and creditor, the ability to discharge should be made available to any debtor that is willing to risk the chance that some of its debts may not be discharged."

Judge Daniel took issue with two prior Colorado Bankruptcy Courts that had relied on good faith under 707(a).

### RES JUDICATA – ARGUMENT

There is nothing about the Bankruptcy Court's ruling which denied the Debtor's request that the second chapter 11 case be converted rather than dismissed which brings prejudice to the Debtor filing now for chapter 7. That ruling came on as a function of the court's restrictions to alter or amend judgments, not necessarily the merits of the Debtor's request.

" There has not been intervening change of controlling law regarding dismissal of a Chapter 11 bankruptcy case, pursuant to § 1112, as determined by the court in its ruling. Debtor does not present argument of new evidence previously unavailable." Quoting the Order Denying reconsideration. Base case Doc 211

To impose *res judicata* limiting the Debtor where congress intended there to be no limitations would require a specific finding and holding. Not to set that as the standard would deprive any Debtor from filing a subsequent bankruptcy case. That is an approach Congress did not take in the bankruptcy code. If anything the court's denial of the CWT Parties' request that the Debtor be enjoined from future filings for 180 days would appear to block that repeated request and supports the Debtor's rights as a citizen.

**DISMISSAL WITH PREJUDICE AND BAR FILING FOR 180 DAYS**

The Debtor has done nothing wrong by seeking an orderly chapter 7 distribution of funds he accumulated while in Chapter 11 bankruptcy. No orders were violated, and the prior dismissal was not voluntary, no code provision allowing a barrier to refiling has been triggered that would come close to justifying the relief the movant requests in this regard. Just as it was in the

**29**

Chapter 11 case, this request should be denied.

WHEREFORE the Debtor pray the Motion be denied and the case proceed

through normal course administration to the benefit of all creditors.

DATED this 10th day of April, 2019.

RESPECTFULLY SUBMITTED FOR:
DENNIS MEYER DANZIK
PROPOSED COUNSEL FOR THE DIP

By:
/s/ Ken McCartney
KEN McCARTNEY, #5-1335
The Law Offices of Ken McCartney, P.C.
P.O. Box 1364
Cheyenne, WY 82003-1364
Telephone: (307) 635-0555
Email: bnkrpcyrep@aol.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of AQpril, 2019, a true and
correct copy of the foregoing *Debtor's Response to the CWT Parties' Motion to Dismiss
and Bar refiling for 180 Days* was served to the following parties:

Daniel Morse                                         Via Electronic Mail Only
Deputy US Trustee

Bradly Hunsicker                                     Via Electronic Mail Only
Marcus Young, *et al*
Counsel for the CWT Parties

/s/ Ken McCartney
KEN McCARTNEY

**31**

Bradley T. Hunsicker (Wyo. Bar 7-4579)
**MARKUS WILLIAMS YOUNG & HUNSICKER LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY  82001
Telephone: 307-778-8178
bhunsicker@markuswilliams.com

Jeffrey M. Eilender (*pro hac vice to be submitted*)
Bradley J. Nash (*pro hac vice to be submitted*)
Joshua D. Wurtzel (*pro hac vice to be submitted*)
**SCHLAM STONE & DOLAN LLP**
26 Broadway
New York, NY 10004
Telephone: (212) 344-5400
Facsimile: (212) 344-7677
jeilender@schlamstone.com
bnash@schlamstone.com
jwurtzel@schlamstone.com

Attorneys for Creditors CWT Canada II Limited Partnership
and Resource Recovery Corporation

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In Re:<br><br>DENNIS MEYER DANZIK,<br>xxx-xx-1786<br><br>Debtor. | Case No. 19-20116<br>Chapter 7 |

## REPLY TO DEBTOR'S RESPONSE TO MOTION TO DISMISS CHAPTER 7 CASE, WITH PREJUDICE

Creditors CWT Canada II Limited Partnership ("CWT Canada") and Resource Recovery Corporation ("RRC") (the "CWT Parties") submit this *Reply to Debtor's Response to Motion to Dismiss to Dismiss Chapter 7 Case, with Prejudice* (the "Reply") and state as follows:

**32**

## BACKGROUND

1.     On March 20, 2019, the CWT Parties filed their *Motion to Dismiss Chapter 7 Case, with Prejudice* (the "Motion"). [Doc. 13.]

2.     On April 10, 2019, Debtor Dennis Meyer Danzik ("Debtor") filed *Debtor's Response to the CWT Parties' Motion to Dismiss the Above Described Chapter 7 Proceeding* ("Debtor's Response," or "the Response"). [Doc. 36.] Debtor makes three arguments in the Response. First, Debtor argues that, as a matter of law, Chapter 7 cases cannot be dismissed for bad faith. Second, Debtor argues that res judicata does not apply to the Court's ruling denying his motion to reconsider. Finally, Debtor denies that he has done anything to warrant dismissal with prejudice.

3.     The CWT Parties file this Reply primarily to address Debtor's argument that bad faith is not 'cause' to dismiss under § 707(a) as a matter of law. Debtor's argument that res judicata does not apply addresses the wrong ruling and his argument that dismissal with prejudice is not warranted simply denies the facts and law set out in the Motion. The CWT Parties ask the Court to grant the Motion and dismiss the case with prejudice.

## AUTHORITY AND ARGUMENT

### I.     Dismissing a Chapter 7 for Bad Faith in the 10th Circuit

4.     First, Debtor argues that, as a matter of law, bad faith is not 'cause' to dismiss under 11 U.S.C. § 707(a). Debtor's Response at 3. Debtor argues that, unlike Chapter 11 or Chapter 13, a Chapter 7 debtor has little or no control over the case and no interaction with creditors. *Id.* at 2. Debtor concludes that a Chapter 7 debtor cannot file in bad faith as a matter of law. *Id.* In addition, Debtor argues that the Motion lacks 10th Circuit

authority and cites a case from the Bankruptcy Court for the District of Colorado holding

that bad faith is not cause to dismiss under § 707(a).  *Id.* at 2–3.

5.      The better reasoned authority holds that bad faith is 'cause' under § 707(a).

In particular, courts have dismissed Chapter 7 debtors who have engaged in egregious

prepetition conduct and filed for reasons other than seeking a 'fresh start.'  These standards

apply to this Debtor and this case.  The Court should dismiss the case under § 707(a).

6.      Section 707(a) provides "[t]he court may dismiss a case under this chapter

only after notice and a hearing and only for cause, including . . . ."  11 U.S.C. § 707(a).

There is a split of authority about whether "cause" includes bad faith:

> The issue of whether bad faith can constitute cause for dismissal under
> § 707(a) has created a division among bankruptcy courts and circuit courts
> around the country.  On the one hand, the Third, Sixth, and Eleventh Circuits
> have held that chapter 7 cases can be dismissed for a debtor's bad faith
> conduct under § 707(a).  On the other hand, the Eighth and Ninth Circuits
> have held that bad faith is not a proper basis for a § 707(a) dismissal.  Even
> within the Tenth Circuit, courts have split on the issue, but the Tenth Circuit
> Court of Appeals has yet to address this question.

*In re Yim Kealamakia*, No. 12-31822, 2013 Bankr. LEXIS 2777, at *11 & n.23 (Bankr. D.

Utah July 9, 2013)).

7.      After reviewing this split of authority and weighing the arguments, the court

in *Kealamakia* rejected the exact argument that Debtor makes here and concluded that

> the absence of an ongoing post-petition relationship between the debtor and
> creditor in Chapter 7 does not in any way suggest a debtor's pre-petition bad
> faith can never provide 'cause' to dismiss.  Therefore, this Court finds that,
> consonant with interpretations of analogous Code sections in different
> chapters, and based upon an examination of the history of § 707, bad faith
> does constitute cause for dismissal under § 707(a).

*Id.* at *21–22 (footnote and internal quotation marks omitted).

**34**

8.      Although bad faith is 'cause' to dismiss under § 707(a), Courts have found

that such dismissal should be limited to "truly egregious cases":

> The Third Circuit has stated that a court should not lightly infer a lack of
> good faith and that dismissal is warranted "only in 'egregious cases that
> entail concealed or misrepresented assets and/or sources of income, lavish
> lifestyles, and intention to avoid a single large debt based upon conduct akin
> to fraud, misconduct, or gross negligence.'" . . . . This Court agrees that
> dismissal on the ground of bad faith should be reserved for truly egregious
> cases.

*Id.* at *22–23 (footnotes omitted).  This narrow bad faith analysis is consistent with the

criticism of bad faith dismissal as a disguised improper evaluation of a debtor's ability to

pay.  *See In re Bushyhead*, 525 B.R. 136, 151 (Bankr. N.D. Okla. 2015) ("[M]ost cases

dismissed under § 707(a) under the guise of 'bad faith' are dismissed primarily due to the

debtor's ability to pay pre-petition debt.").

9.      Such a narrow view of bad faith—requiring egregious conduct for dismissal

under § 707(a)—has broader support.  In fact, although the Eighth Circuit is cited as

holding that bad faith does not support dismissal under § 707(a), *see In re Yim Kealamakia*,

2013 Bankr. LEXIS 2777, at *11, it actually supports a "bad faith" dismissal, but only in

extreme cases:

> Eighth Circuit has held that a debtor's bad faith in filing a Chapter 7 case
> may be cause for dismissal of the case, but that "bad faith under § 707(a)
> [must] be limited to extreme misconduct falling outside the purview of more
> specific Code provisions, such as using bankruptcy as a 'scorched-earth'
> tactic against a diligent creditor, or using bankruptcy as a refuge from another
> court's jurisdiction."

*In re Bushyhead*, 525 B.R. at 143 (quoting *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir.

1994)).

**35**

10.     Finally, there is substantial authority in the 10th Circuit that bad faith is 'cause' to dismiss under § 707(a). *See, e.g.*, *In re McGuire-Pike*, No. 14-13365 ta7, 2015 Bankr. LEXIS 2282, at *9 (Bankr. D.N.M. July 10, 2015) ("[B]ad faith can constitute cause for dismissal under § 707(a)."); *In re Snyder*, 509 B.R. 945, 950 (Bankr. D.N.M. 2014) ("The Court adopts the view that bad faith can constitute cause for dismissal under § 707(a)."); *In re Quinn*, 490 B.R. 607, 616 (Bankr. D.N.M. 2012) ("The Court, therefore, concludes that a 'bad faith filing' may constitute 'cause' for dismissal of a Chapter 7 bankruptcy case under 11 U.S.C. § 707(a)."); *In re Tanenbaum*, 210 B.R. 182 (Bankr. D. Colo. 1997) ("The absence of good faith of a debtor is also sufficient cause for dismissal under Section 707(a).")

11.     Here, the CWT Parties ask the Court to dismiss the case under § 707(a) on the basis that Debtor filed the case in bad faith. The CWT Parties are not seeking dismissal because Debtor can pay his debts. The CWT Parties are seeking dismissal based on Debtor's relentless litigation and bankruptcy efforts to avoid his $7 million liability to the CWT Parties based on fraud. The facts set out in the Motion show that this is one of the 'egregious cases that entail[s] concealed or misrepresented assets and/or sources of income, lavish lifestyles, and intention to avoid a single large debt based upon conduct akin to fraud, misconduct, or gross negligence.'" *In re Yim Kealamakia*, 2013 Bankr. LEXIS 2777, at *22–23. Further, this is a case where the Debtor has used bankruptcy as a "'scorched-earth' tactic against a diligent creditor." *In re Bushyhead*, 525 B.R. at 143. Even in the Eighth Circuit, such conduct is 'cause' to dismiss under § 707(a). *See In re Huckfeldt*, 39 F.3d at 832. This law is consistent with the factors and analysis set out in the Motion

showing that this is an egregious case of consistent misuse of bankruptcy protection by a debtor warranting dismissal under § 707(a).

12.     Finally, even if the Court finds that bad faith is not 'cause' to dismiss under § 707(a), the Court should still dismiss the case because Debtor filed for improper, noneconomic reasons.  Debtor's millions in nondischargeable debt show that Debtor did not file this case to get a fresh start because those obligations guarantee that Debtor will not enjoy the benefit of Chapter 7 fresh start.

13.     Where a debtor will not enjoy a fresh start, the court may infer that debtor filed the case for an improper purpose and dismiss the case.  *See In re Bilzerian*, 258 B.R. 850, 857 (Bankr. M.D. Fla. 2001) ("$130,650,328.17 is owed on account of the nondischargeable debts. . . . Another $9 million is owed to the Internal Revenue Service which . . . would be nondischargeable . . . It can reasonably be inferred from these facts that Bilzerian did not file this case to get a 'fresh start.'); *In re Barry*, 19 Fla. L. Weekly Fed. B 108 (U.S. Bankr. N.D. Fla 2005) ("Since almost all of the debts listed in this bankruptcy are excepted from discharge and there are no assets to be distributed to creditors, the question becomes what useful purpose will be served by the continuation of this case.  The answer to that question is none.").

14.     When a debtor files Chapter 7 for improper, noneconomic motives—like delay—instead of seeking honest economic relief, dismissal under § 707(a) is warranted. *See In re Bushyhead*, 2016 U.S. Dist. LEXIS 186308, at *23 ("[P]ermitting dismissal for conduct evidencing 'noneconomic motives,' . . . most closely adheres to the Congressional purpose of § 707(a).").  Economic versus noneconomic motives are determined by

examining "whether the petition was filed with the intent and desire to obtain the relief that is available under a particular chapter of the Bankruptcy Code. . . or whether the debtor is pursuing some other goal." *Id.*

15.     Here, Debtor's purpose in filing this case is to frustrate the CWT Parties' efforts to enforce their rights against him.  Debtor's repeated statements about wanting an "orderly distribution" is inconsistent with his conduct during his last two bankruptcy cases, in which, as debtor-in-possession, he failed to even propose a plan. This noneconomic motive is improper and warrants dismissal of the case.

16.     In short, Debtor's egregious bad faith prepetition conduct: his lavish lifestyle, abusive litigation conduct, and scorched earth bankruptcy tactics to avoid his $7 million fraud judgment—all without the ability to enjoy the economic relief offered by Chapter 7—is cause to dismiss under § 707(a).  The Court should follow the facts and law set out in the Motion and dismiss the case with prejudice.

## II.    Res Judicata

17.     Debtor asserts that res judicata does not apply.  Response at 6.  Debtor asserts that "[t]here is nothing about the Bankruptcy Court's ruling [denying Debtor's motion to reconsider] which denied the Debtor's request that the second chapter 11 case be converted rather than dismissed." *Id.*  The Court should reject Debtor's argument and find that res judicata applies and bars debtor from resisting dismissal.

18.     First, Debtor misses the relevant ruling.  Debtor's argument focuses entirely on the Court's order denying his motion to reconsider.  It is the Court's order dismissing his second Chapter 11, however, that controls this issue and bars him from resisting

**38**

dismissal.  In resisting the CWT Parties' Motion to Dismiss his most recent Chapter 11, Debtor failed to assert that the case should instead be converted to Chapter 7.  As the Court noted in its Order Denying Motion to Alter, "Debtor never argued for conversion to Chapter 7 liquidation proceedings instead of dismissal before or during the hearing," and "[a]ll creditors had notice of CWT's Motion to Dismiss, yet none contested it or advocated for conversion to Chapter 7, rather than dismissal."  Debtor had the opportunity to oppose dismissal or urge conversion but did not do so.  Accordingly, he is barred from seeking that protection now.

19.    Second, the Court has repeatedly ruled that Debtor does not belong in Chapter 7—that dismissal, not conversion, is in the best interest of the estate and creditors. The Court ruled when it dismissed Debtor's first case that "[i]t is in the best interest of the estate to dismiss."  The Court adopted this analysis when it dismissed the second case: "The court applies the same analysis from Debtor's first case . . . . it is in the best interest of the estate and creditors that the court dismiss the case."  Most recently, when Debtor asked the Court to reconsider this ruling and convert the case instead, the Court rejected his argument and maintained that dismissal, not conversion, was appropriate.  Nothing has changed since these rulings and so they continue to have persuasive, if not binding, force. The Court should find that res judicata controls this issue and bars Debtor from filing Chapter 7.

### III.    The Court Should Dismiss the Case with Prejudice and Bar Debtor from Filing for 180 Days

20.    Finally, Debtor asserts that he "has done nothing wrong" by filing Chapter 7 and that none of the bases for dismissal with prejudice apply to this case.

21.    Debtor's bare denial is insufficient to overcome the facts and law set out in the Motion.  Debtor has shown no hesitation about repeatedly filing bankruptcy cases without any intention of following through on those cases.  Debtor has abused the bankruptcy process—including dragging out two Chapter 11 cases to bad faith dismissal without any effort to file a plan—now filing a Chapter 7 days after his previous bankruptcy was dismissed.  These actions show that a bar to refiling is warranted.

22.    Debtor's three-sentence response fails to address the Debtor's repeat filing, defiance, dishonesty, and abuse of process which are set out in the Motion in detail.  The Court should dismiss the case with prejudice as requested in the Motion.

### CONCLUSION

**WHEREFORE**, the CWT Parties ask the Court to grant the Motion.

Dated: Cheyenne, Wyoming
May 2, 2019

Respectfully submitted,

**CWT Canada II Limited Partnership and Resource Recovery Corporation,** *Creditors and Movants*

By: /s/ Bradley T. Hunsicker
Bradley T. Hunsicker, #7-4579
**MARKUS WILLIAMS YOUNG & HUNSICKER LLC**
106 East Lincolnway, Suite 300
Cheyenne, WY 82001

**40**

Telephone: (307) 778-8178
Facsimile: (307) 638-1975
E-Mail: bhunsicker@markuswilliams.com

*Attorneys for Creditors CWT Canada II
Limited Partnership and Resource Recovery
Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on May 2, 2019 *electronically,* via the Court's CM/ECF system upon the following parties who have entered their appearance in the above-captioned matter.

**Ken McCartney**
The Law Offices of Ken McCartney, P.C.
P.O. Box 1364
Cheyenne, WY 82003
bnkrpcyrep@aol.com
*Attorney for Debtor*

*/s/ Bradley T. Hunsicker*
Bradley T. Hunsicker

**41**

```
                     UNITED STATES BANKRUPTCY COURT
                         DISTRICT OF WYOMING

IN RE:                          .    Case No. 19-20116
                                .    Chapter 7
DENNIS MEYER DANZIK,            .
                                .
            Debtor.             .
. . . . . . . . . . . . . . .   May 15, 2019
```

**TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
**CATHLEEN D. PARKER, UNITED STATES BANKRUPTCY JUDGE**

APPEARANCES:

```
For the Debtor:                 Law Offices of Ken McCartney
                                By:  Ken McCartney
                                P. O. Box 1364
                                Cheyenne, WY  82003
                                (307) 635-0555


                                Wilenchik & Bartness, PC
                                By:  Dennis Wilenchik
                                2810 North 3rd Street
                                Phoenix, AZ  85004
                                (602) 606-2810

For Creditor, CWT Canada II     Marcus Williams Young &
Limited Partnership and             Hunsicker, LLC
Resource Recovery               By:  Bradley T. Hunsicker
Corporation:                    106 East Lincolnway, Suite 300
                                Cheyenne, WY  82001


Also Present:                   Dennis M. Danzik
                                Anthony Ker
                                William Hinz


Court Recorder:                 Clerk's Office
                                U.S. Bankruptcy Court
                                2120 Capitol Avenue
                                Cheyenne, WY  82001

Transcription Service:          AB Court Reporting & Video
                                216 16th Street, Suite 600
                                Denver, CO  80202
                                (303) 296-0017
```

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1                          INDEX

2
WITNESS                    Direct     Cross     Re-Direct     Re-Cross

3
ANTHONY KER
4   By Mr. McCartney        10

5   WILLIAM HINZ
    By Mr. McCartney        26
6   By Mr. Hunsicker                   28

7   DENNIS M. DANZIK
    By Mr. McCartney        34
8   By Mr. Hunsicker                   44

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    (Time noted:  10:40 a.m.)

 2              THE COURT CLERK:  All rise.  United States

 3 Bankruptcy Court for the District of Wyoming, the Honorable

 4 Judge Parker, presiding, is now in session.

 5              THE COURT:  Thank you.  Please be seated.

 6              Okay, we are here this afternoon in docket 19-

 7 20116, the Debtor is Dennis Danzik.

 8              Evidentiary hearing on CWT's motion to dismiss,

 9 and response filed.

10              Appearances, beginning with Debtor's counsel,

11 please.

12              MR. MCCARTNEY:  Good afternoon, Your Honor.  Ken

13 McCartney, P. O. Box 1364, in Cheyenne.  I'm here this

14 afternoon with co-counsel, Dennis Wilenchik from Arizona, who

15 the Court has authorized to appear *pro hac vice* in an order

16 dated yesterday.

17              THE COURT:  Thank you.  For CWT?

18              MR. HUNSICKER:  Good afternoon, Your Honor.  Brad

19 Hunsicker, Marcus Williams Young & Hunsicker.  I'm here today

20 representing the CWT parties.

21              THE COURT:  Thank you.  Preliminary matters?

22         (Pause)

23              THE COURT:  What are we looking at for exhibits?

24 I have two volumes.  Are these Debtor's exhibits?

25              MR. MCCARTNEY:  Yes, Your Honor.

**44**

```
 1                THE COURT:  Okay.  So I have 1 through 14, then I
 2   have 1 through 26.
 3                Do we have any exhibits for CWT?
 4                MR. HUNSICKER:  No, Your Honor.
 5                THE COURT:  Okay.  So we have volume one, 1
 6   through 14.  Mr. Hunsicker, did you have a chance to review
 7   those?
 8                MR. HUNSICKER:  Briefly, Your Honor.  The exhibit,
 9   I think, we due last Wednesday.  I didn't receive anything
10   until this weekend.  I received, I believe, six separate
11   emails, and those emails included what I believed to be 1
12   through 14.
13                So anything after 14, I have not received, to my
14   knowledge.  These were sizeable emails.  They might have
15   gotten kicked back.
16                But I did receive 1 through 14 via email on
17   Saturday, I glanced at those exhibits.  We will not be
18   stipulating to the admission of any of those items.
19                THE COURT:  I assume the same for volume two, 1
20   through 26?
21                MR. HUNSICKER:  Yes, I haven't seen any of those.
22   But we would not be stipulating, I'm guessing, even if I had
23   seen them.
24                THE COURT:  All right.
25            (Pause)
```

**45**

1          THE COURT:  Mr. Hunsicker, it's your motion.

2          MR. HUNSICKER:  Thank you.  Your Honor, given the

3   breadth of the last minute exhibits, I have a feeling that

4   the Debtor is going to try to drag this hearing out as long

5   as possible, and likely try to get to 5:00 or 5:30.

6          THE COURT CLERK:  Counsel, could I ask you to get

7   a little closer to the microphone?

8          MR. HUNSICKER:  Sure.

9          THE COURT CLERK:  Thank you.

10         MR. HUNSICKER:  Your Honor, as I was saying, I

11  think with the amount of exhibits here today, and glancing at

12  those exhibits, I think that the goal is probably to try to

13  get to 5:00 o'clock without completing the hearing, in the

14  hopes that the case -- this matter gets continued for another

15  30, 60 days, you know, who knows.

16         I think we're going to see a lot of the same,

17  which is just an over all goal to delay and to see how long

18  we could possibly keep Mr. Danzik in bankruptcy in Wyoming.

19         The CWT parties are here today asking the Court to

20  dismiss this case for cause under 11 U.S.C. 707(a), on the

21  basis that this case was filed in bad faith.

22         We believe that this case serves absolutely no

23  purpose other than to prejudice my client and all creditors.

24         We also believe that allowing this case to move

25  forward would render this Court's prior decision where it

**46**

1  found that the dismissal of a bankruptcy, rather than

2  conversion, was in the best interests of all creditors.  It

3  would render that decision meaningless.

4          So I'm going to be very brief in my opening to try

5  to get us to the end of the day.

6          The burden to establish cause can be demonstrated

7  in this case through everything that the Court has seen.  We

8  don't need to offer evidence of any witness or any document.

9  The Court is extremely familiar with Mr. Danzik, and so I

10  believe I will really be limiting my case to legal argument.

11          I believe that it is time for Mr. Danzik to vacate

12  the Bankruptcy Court.  He has been using this Court as his

13  safe haven for the last three years.

14          His creditors during that time period have not

15  received one dollar.

16          I will reserve the remaining time I have for

17  closing.

18          Thank you.

19          THE COURT:  Thank you.  Mr. McCartney?

20          MR. MCCARTNEY:  Well, Your Honor, of course I

21  disagree with the proposition that he doesn't have the burden

22  of proof.  It is definitely necessary that they go forward to

23  show the allegation of bad faith.

24          I had briefed the issue in our response to their

25  motion, Your Honor, and I'm not so sure there is a bad faith

1   dismissal possible in a Chapter 7 case.  The Code seems to be
2   noticeably silent in that regard, and at least one District
3   Court sitting on appeal has made it pretty clear that the
4   Appellate Court didn't even believe that bad faith dismissal
5   occurs in Chapter 7.

6           If Congress wanted that language in the Statute,
7   they could have very easily put it in in 1978, or in the '85
8   amendments, and they didn't choose to do that.

9           But be that as it may, we don't intend today to
10  rely on the legal situation.  We intend, instead, to show
11  that this Debtor is not proceeding in bad faith.  He hasn't
12  been in bad faith since day one.

13          We're going to explain to you where he's coming
14  from and how he got there, and why he's here.  And I think
15  when we're finished, we will have convinced you that Mr.
16  Danzik isn't doing anything in bad faith, that the reason
17  he's here today requesting Chapter 7 relief is very simply to
18  enforce an orderly distribution of substantial assets that
19  are available for that purpose, and that will not be
20  distributed according to the Uniform Rules of Chapter 7 if
21  he's not allowed to continue.

22          And we even placed a Chapter 7 Bankruptcy Trustee,
23  who has the power to administer.

24          There is nothing in the Bankruptcy Code that says
25  more than one bankruptcy filing is bad faith.  There is no

1  inference to be drawn there at all.  It is necessary for the

2  movant today to demonstrate where there is bad faith when a

3  debtor willingly comes into the courtroom under a request for

4  Chapter 7 relief.

5          And that isn't going to be easy for anybody to

6  prove, because Mr. Danzik's purpose is declared and

7  intentional, and not surreptitious at all.  And there is

8  nothing about it that's unfair to anybody.  In fact, it's

9  much fairer to everybody, and the operative word here is in

10  the creditors', that's plural, best interests, it is a

11  Chapter 7.

12          This long and sordid tale starts with the sale of

13  a refinery.  We're not going to take very long to do it, but

14  we're going to bring you through the steps that got us here

15  today, beginning with the time of the refinery purchase and

16  ending with the New York court which has given rise to

17  controlling precedent in this jurisdiction.

18          We do not intend to re-litigate everything, but we

19  want to show the attitudes and reasons with which Mr. Danzik

20  comes to this Court.  We think it's necessary for a little

21  bit of background in that regard.

22          Thank you.

23          THE COURT:  Thank you.  Mr. Hunsicker?

24          MR. HUNSICKER:  Your Honor, as I mentioned in my

25  opening, I really intend to rely on the briefs in this case

**49**

1   and walk through 707(a), and the factors that the Court can

2   consider when deciding if the case should be dismissed on bad

3   faith grounds.

4          I don't need a witness to do that.  I don't need

5   any documents to do that.  I think everybody in this

6   Courtroom is familiar with the facts of what has happened

7   with Mr. Danzik in this Bankruptcy Court over the last three

8   and a half years.

9          So I don't have any witnesses that I intend to

10  call.  If Mr. McCartney would like to do that, great.  If

11  not, I would just move directly into closing arguments.

12          THE COURT:  Mr. McCartney?

13          MR. MCCARTNEY:  I certainly have witnesses, Your

14  Honor.

15          THE COURT:  Okay.  Call your first one, then,

16  please.

17          MR. MCCARTNEY:  Would the Court consider a

18  directed verdict for the Movant having failed to carry his

19  burden of proof?

20          THE COURT:  I would not at this point, because we

21  do have some findings this Court previously made involving

22  the lack of assets given for distribution of -- two riders,

23  and so we would not base the need to find that there is, in

24  fact, some assets to be distributed to creditors to show a

25  substantial Chapter 7 or to show a Chapter 7 purpose.

1          So we're not going to do directed at this time.

2          MR. MCCARTNEY:  Thank you, Your Honor.  The right

3    to preserve.

4       (Pause)

5          THE COURT CLERK:  Approach to be sworn, and then

6    sit in this seat over here.

7          Do you solemnly swear, under the penalty of

8    perjury, that the testimony you're about to give in this

9    matter now before the Court is the truth?

10         MR. KER:  I do.

11         THE COURT:  Thank you.

12      Whereupon,

13                         ANTHONY KER

14      was duly sworn.

15         THE COURT CLERK:  Please have a seat.

16         MR. HUNSICKER:  Your Honor, before we start, I

17   think the Debtor is required to be at this proceeding.

18         MR. MCCARTNEY:  He's going to be here.

19                    DIRECT EXAMINATION

20      BY MR. MCCARTNEY:

21      Q.   Would you state your full name, please?

22         THE COURT:  Is Mr. Danzik here?

23         MR. MCCARTNEY:  He's not in the building, Your

24   Honor, but he's in Cheyenne.

25         THE COURT:  Okay.  I don't know how to look at

1   this, but --

2           MR. MCCARTNEY:  He's going to testify this

3   afternoon.

4           THE COURT:  Okay.  Because I don't know that --

5   there's certain hearings he has to be at and there's hearings

6   they don't have to be at, and I haven't had to look at the

7   issue.

8           MR. MCCARTNEY:  I think hearings where it says you

9   have to be include confirmation of Chapter 13 by Local Rule.

10  But I'm not aware of a Local Rule with respect to motions to

11  dismiss.

12          THE COURT:  Yeah, I don't know that we do.

13          MR. MCCARTNEY:  I suspect we're going to find out

14  here in just a minute.

15          May we proceed?

16          THE COURT:  Go ahead.

17      BY MR. MCCARTNEY:

18      Q.   Would you state your full name, sir?

19      A.   Yes.  My full name is Anthony David John Ker.  The

20  last name is K-e-r.

21      Q.   Mr. Ker, how are you related to Dennis Danzik?

22      A.   I have a business relationship with Mr. Danzik

23  that's going back between eight and nine years.

24      Q.   And were you in any manner connected with the

25  related-to publicly traded company that we've referred to

**52**

1  today as RDX Technologies, formerly Ridgeline?

2       A.    That is correct.

3       Q.    And how were you associated with that

4  organization?

5       A.    Initially, I was the CEO of the company.  And then

6  after we made an acquisition of technology, after a period of

7  time Mr. Danzik became the CEO and I became chairman of the

8  board.

9       Q.    And did you serve in that capacity at times

10  relative to the Missouri Refinery acquisition?

11       A.    At the time of the Missouri acquisition, I was

12  chairman of the board.

13       Q.    And would you explain to me and the Court what

14  that acquisition involved?

15       A.    That acquisition was supposed to be a very good

16  business deal for us in the sense that it took technology and

17  applied it to our process of collecting fats, oils, and

18  grease.

19            And then the CWT Missouri Refinery technology was

20  supposed to render them or convert them into biodiesel fuels

21  that were -- that met the grade for getting tax credits or

22  riddance for the company.

23            The fundamental basis for that is that the

24  refinery worked in the conversion of these fats, oils, and

25  grease, into a diesel product that could meet the tax credit

**53**

1  criteria.

2      Q.   Tax credit criteria meaning that it would be

3  functional in an automobile?

4      A.   No.   It might not be, but it had to meet the

5  standards of -- and I can't remember the name of the rule,

6  but there was a certain standard that it had to meet.   If it

7  didn't meet that standard, two things happened.

8           One:   You couldn't use it properly.

9           And, more importantly, from a financial point of

10 view, you weren't allowed to collect the tax credit or the

11 ridden for that product.   It didn't allow you to do that

12 unless you met the standard of producing that product.

13     Q.   And who was the guardian of that standard?   Who

14 checked it out to see whether it did or didn't?

15     A.   Well, there's a whole organization at the EPA that

16 has to meet that standard, and I'm trying to remember the

17 name of the documents, but there's a standard where the IRS

18 sets it, and it has to -- it's supposed to be tested by the

19 IRS.

20          Now, just an interesting aside there is that in

21 the acquisition that was supposed to have happened.   But we

22 determined after the fact that the IRS never actually carried

23 out its test.

24          And so prior to us taking over the refinery, that

25 company collected a whole bunch of money from the federal

**54**

1  government and the IRS on the basis of a flaw, in the sense

2  that the IRS never actually did the inspection.

3      Q.   While you were chairman of the board, and RDX had

4  an offer in the refinery, did you notice anything about the

5  product that you were couldn't show in the market?

6      A.   Pardon?  Your last part of that question?

7      Q.   The product that you were putting on the market,

8  did you notice anything about it?

9      A.   Oh, yes.  We sent it out to our customers, and

10 after a period of time of using them, we got nothing but

11 complaints because the product was not working, and it was

12 destroying their equipment.

13          And we had to go back in and determine what was

14 the cause of it.  And it was the caustic nature of the

15 product that was not meeting standard.

16     Q.   Look in the white binder at exhibit 13, and tell

17 me what that one is.

18     A.   I believe I already know it is, but I will

19 confirm.  It's the unit purchase agreement by and among

20 Ridgeline Energy Services and CWT Canada, Resource Recovery

21 Corporation, Gem Holdco, and CWT Enterprises.

22     Q.   What does the unit purchase agreement do?

23     A.   Well, in summary, what this agreement does is we

24 buy the company with all of its assets of CWT, which included

25 the refinery and all of the aspects that went on with that.

1          So we bought the entity that included all of the

2   assets and the technology to produce this supposed biodiesel.

3          Q.   And did you attempt to live by the terms of that

4   contract?

5          A.   Absolutely.

6          Q.   Did there come a point in time when you cried foul

7   over the refinery's situation?

8          A.   Yes.  Several times we cried foul, and we actually

9   tried to work with the seller on a couple of instances.

10         First of all, it wasn't working.  And then the

11  seller, the key architect, Bruce McFarlane of that, said "Oh,

12  yes, it works."

13         And we had meetings at Scottsdale, and he said

14  "Yes, it does work."  And we said, "Well, no, we can't get it

15  to work.  It doesn't work."

16         We even brought an independent testing agency, I

17  think called Gen Star, to test the process.  They said, "No,

18  it doesn't work.  You will not meet standard."

19         Now, we had a connection with a gentleman who was

20  at one point the head of the EPA.  We asked him to

21  investigate because of his experience in this particular

22  field.  And he said "No, it's not working."

23         And it was very disappointing, so again we talked

24  to them about it and said "Look, this is not working."

25         Mr. McFarlane offered to go down and show us how

**56**

1  to make it work.  He never did it.  We offered him, said

2  "Come on in, show us how it works."  He never did take us up

3  on that.

4          So at the point when we had a couple of meetings

5  in Scottsdale over this, immediately we got into it.  They

6  started talking about reducing the purchase price.

7          So we said "it doesn't work, we're not going to

8  pay."  All of that happened over a couple of meetings over a

9  period of a few weeks, and each meeting was probably a half a

10  day long.

11      Q.   Did there come a point in time when you just gave

12  up on notifying them?

13      A.   Yeah.  Well, you know, I'll tell you something.

14  I've worked with Dennis now for -- Mr. Danzik over there for

15  about almost nine years.

16      Q.   Uh-huh.

17      A.   He has worked harder than anybody I've ever known

18  in my career.  And I think I work very hard.

19          But when that happened, I remember I was on a trip

20  to Europe, and I get a phone call from Mr. Danzik, saying

21  "look, we've had the Gen Star people in," and I think that's

22  the name of the independent organization, they said "look,

23  you're not going to get this to work.  It won't work.  We're

24  screwed here."

25          And then he -- what he did at that point is he

1   says "we cannot sell any more rates and tax credits because I

2   now know it's illegal to do that."

3          Then he proceeded to work for months to try and

4   find a way to fix it, to see if it was something that could

5   be done, because he's a pretty bright engineer.

6          I remember we talked about all different things,

7   like putting more money into the front system, revamping the

8   system.

9          And he's not a guy that says quit very easily, but

10  he said at the end of it "look, I can't fix this.  It's just

11  not going to work."

12      Q.   All right.  Do you remember negotiating the unit

13  purchase agreement?

14      A.   Yes, I do.

15      Q.   And did you have concerns about the refinery

16  refining, given the amount of time you had to do due

17  diligence?

18      A.   There was a huge pressure from Mr. Nolty and from

19  Mr. McFarlane to close as fast as possible.

20      Q.   Uh-huh.

21      A.   In fact, he told me every day.  He said "can you

22  get approval from the Alberta Securities Exchange to close as

23  fast as possible?  We have to close it as fast as possible.

24  We don't have anymore time to do due diligence."

25          But I weighed that off against a couple of things.

1       They had been collecting these tax credits for

2  many years.  The IRS had signed off on it.  So who am I to go

3  in and say the IRS is wrong in paying these things?  I mean,

4  as a director of the company, I thought that was probably the

5  best security we had, in that they had satisfied the IRS

6  requirements for collecting them.

7       Q.   And did you negotiate a particular provision in

8  the contract that provided an out if the refinery didn't

9  refine?

10      MR. HUNSICKER:  Objection, Your Honor.  One,

11  that's leading.

12      But, two, I don't understand the relevance of any

13  of his testimony at all.  I don't see how anything to do with

14  RDX or this refinery has anything -- any bearing on

15  dismissing this case under 707(a) on bad faith grounds.

16      MR. MCCARTNEY:  Your Honor, his client has called

17  my client a crook at every proceeding that we've had and

18  every pleading that's been filed.  In five minutes, we're

19  going to talk about Mr. Danzik stole any money from --

20      MR. HUNSICKER:  Your Honor, I don't think --

21      MR. MCCARTNEY:  This man has a unique

22  understanding and background to be able to do that.

23      THE COURT:  The problem -- and it's not for me to

24  find whether or not he did, because I can't do anything with

25  that judgment.  I mean, you've acknowledged I'm bound by the

 1  New York judgment.

 2          MR. MCCARTNEY:  I understand, Your Honor.  But

 3  you're the one to determine whether or not Mr. Danzik

 4  appeared in this proceeding in good faith.

 5          THE COURT:  Correct.

 6          MR. MCCARTNEY:  And if he's a crook, good faith is

 7  at a higher standard than if he isn't.  We need this

 8  evidence.

 9          THE COURT:  I don't think the Court has ever taken

10  the position that Mr. Danzik is a crook.

11          MR. MCCARTNEY:  I don't either.

12          THE COURT:  So I understand.  I'm fine with you

13  laying background on how we got here.  I have a pretty good

14  understanding because we've talked about it in argument

15  perspective.

16          But we're not going to re-evaluate the

17  appropriateness of the judgment, the standard that came out

18  from underneath the judgment.

19          For your purposes, really, when I dismissed this

20  case rather than converting it, the reason that basically the

21  information I had in front of me, there were no assets to be

22  distributed to creditors other than the IRS.  So there was no

23  purpose to remain in bankruptcy.

24          And I have that same concern going forward.  What

25  is the purpose of this bankruptcy?  In order to find that,

1   I'm going to have to find that there are assets that are

2   going to be able to be distributed to creditors other than

3   the IRS.

4            So as you go forward, those are -- that's the type

5   of information that personally I think is going to be most

6   important today.

7            I'll give you leeway to do the background, but

8   just -- you don't need to go over too much detail, because

9   I'm not going to revisit.

10           MR. MCCARTNEY:  I understand.

11       BY MR. MCCARTNEY:

12       Q.   Let's move along quickly, Tony.

13           My question was:  Did you negotiate some

14   protection in the contract because you couldn't do due

15   diligence?

16       A.   Yes, we did.

17       Q.   Would you tell me what that is, please?

18       A.   As a protection if we found any particular

19   problems, we had a right to set off and a right to withhold

20   payments.

21       Q.   Will you show me where that is in the contract,

22   please?

23       A.   I think it's the --

24       Q.   I think I gave you one that isn't marked.

25       A.   That's okay, I can find it.  I've read it many

1  times.

2          It is section 1127, right of set off.  Upon notice

3  to -- do you want me to read it off, or not?

4          Q.   No.  Just tell me what it does.

5          A.   Basically what it says is that if we have a

6  reasonable basis for a problem, that we're entitled to either

7  set off or to withhold all payments against the UPA.  That's

8  our understanding.

9          Q.   And did there come a point in time when you

10  withheld to CWT?

11         A.   Yes, we did.

12         Q.   And did those payments include tax credits?

13         A.   Yes.

14         Q.   Okay.

15              MR. MCCARTNEY:  We would offer exhibit 13, Your

16  Honor.

17              MR. HUNSICKER:  Did you say exhibit 18?

18              THE COURT:  13.

19              MR. MCCARTNEY:  I think 13.

20              MR. HUNSICKER:  Your Honor, I'm going to object.

21  I don't think a foundation has been laid.  I don't quite

22  understand the connection here to the witness and his

23  knowledge of this agreement.  He didn't sign this agreement.

24  It looks like Dennis Danzik signed this on behalf of

25  Ridgeline, given CWT authorities also executed this.

1        But again, it's also common knowledge.

2        THE COURT:  I'll overrule the objection and allow

3   exhibit 13.

4        BY MR. MCCARTNEY:

5        Q.    This man's client claims that Mr. Danzik purloined

6   $3 million dollars.  Are you familiar with that claim?

7        A.    Yes, I am.

8        Q.    Would you tell me where that $3 million dollars

9   comes from and what you know about it?

10        A.    He alleged that the $3 million dollars, or the

11   money that was supposed to be in there, was from the IRS

12   refund of tax credits.

13        And there's a dispute over all of that in the

14   sense that we did receive tax credit funds, but we were not

15   obligated to earmark them, put them in trust, pay them

16   directly to them in preference to any other creditor.  There

17   is no reference to that anywhere.  There was no agreement

18   made to do that in any way.

19        And so he has made a big case out of something

20   that's not there.  And even if you read the agreement even

21   further, that was all supposed to be settled on closing, not

22   months later.

23        Q.    Did these credits come before or after closing?

24        A.    Well after closing.

25        Q.    What do you know about the actual money?  Were you

1  involved at all?

2       A.   I had an idea of some of the money flow, but as

3  the chairman, I questioned Mr. Danzik and I questioned the

4  CFO at the time on the flow of money.  So to that extent, I

5  know a fair amount about it.

6       Q.   And if you could just tell me right quickly what

7  you know what happened to the $3 million dollars?

8       A.   Well, the money was used in operations.

9       Q.   Why?

10      A.   By Ridgeline RDX.  It was used for operations,

11  maintaining the business, trying to rectify the problems that

12  occurred because we bought a fraud in the refineries.  Mr.

13  Danzik tried to fix that problem.  We had lots of bills to

14  pay, and we kept working to try and fix it.  It was

15  unfixable.

16      Q.   Did you have occasion to have the company's books

17  audited for the purpose of getting this done?

18      A.   We had a complete forensic review done.  At the

19  time, we didn't.  When it was all the way done, we didn't

20  have time for all of that, but we had a complete forensic

21  report done by Craig Wright, who is trade well known forensic

22  auditor.

23      Q.   I don't want you tell me his opinion, but I want

24  you to tell me yours today.

25      A.   My opinion is based on several factors.  First of

**64**

1  all, there was a -- the CFO, and I have to really give this

2  background so you understand how decisions were made.

3          The first thing is the CFO, in one minute, she

4  produced an affidavit that was absolutely in favor of Mr.

5  Danzig.

6          And then very shortly after it, she recanted all

7  of that.  And then she phoned me and sent me a bunch of notes

8  saying that Mr. Danzik stole all of this money.

9          And as chairman, I put everything on hold and had

10 a board meeting, where things kind of blew up.  And I

11 terminated Mr. Danzik based on the information that I had

12 received from Ms. Blazer.

13         And then I started going back and asking Ms.

14 Blazer, "okay, show me the evidence what you have to make

15 these allegations."  And I had my own records, because at one

16 time I was the CEO.

17         And there were a couple of items in there when I

18 looked at it where I said "you're not telling me the truth on

19 this.  You need to provide me with more backup on this

20 information."

21         And she refused.  She actually said to me, she

22 said "you are only going to use this information to prove

23 Dennis' innocence."  And I said "well, whatever it is, I need

24 to know.  I'm chairman here."  And I said "give me access to

25 all of the bank records."

1          She cut me off from the bank records, because,

2    believe it or not, she was the only signatory on the bank

3    accounts.  She actually talked to the head of the banks and

4    said "don't let a director or officer of the company get

5    access to these bank accounts," because "all you're going to

6    do is use it to prove Dennis' innocence."

7          And that was very frustrating.

8          Then after that, I re-engaged Dennis to try and

9    help save the company, which didn't work because we had a ton

10   of legal pressure and legal bills from CWT, and CWT's

11   associates, all pounding on us to try and get money out of us

12   or to destroy our company, because we were claiming that they

13   produced a fraud.

14         I don't know if I answered your question, but,

15   yes, I did become familiar with it.  And I brought Mr. Danzik

16   back, so I looked at the information that she provided, it

17   was inconsistent, and I did my own analysis.  Then we had

18   Craig Wright come out and do his analysis audit.

19         So I have a very high degree of confidence that

20   the money was not stolen.  The money went into operations,

21   and was used for the operating results of RDX.

22         MR. MCCARTNEY:  Thank you very much.

23         THE COURT:  Thank you.  Any cross-examination?

24         MR. HUNSICKER:  No, Your Honor.  I would move to

25   strike his entire testimony as completely irrelevant to the

1   matter before the Court here today, which is whether or not

2   this third bankruptcy filing in three years should be

3   dismissed for cause.

4           THE COURT:  I will overrule that, and allow Mr.

5   McCrtney to call his next witness.

6           MR. MCCARTNEY:  We call William Hinz.

7           THE COURT CLERK:  Do you solemnly swear, under the

8   penalty of perjury, that the testimony you're about to give

9   in this matter now and here before the Court, is the truth?

10          MR. HINZ:  I do.

11          THE COURT CLERK:  Thank you.

12      Whereupon,

13                          WILLIAM HINZ

14      was duly sworn.

15          THE COURT CLERK:  Please have a seat.

16                      DIRECT EXAMINATION

17      BY MR. MCCARTNEY:

18      Q.   Good afternoon, sir.

19      A.   Good afternoon.

20      Q.   If you'd state your full name, please?

21      A.   William Hinz.

22      Q.   Mr. Hinz, where are you from?

23      A.   From Arizona.

24      Q.   And how are you employed?

25      A.   I am the chairman and CEO of a company called

1 | Inductance Energy.

2 |     Q.   And what is the product or service that company

3 | provides?

4 |     A.   It is in development phases of developing a system

5 | to create energy without the need for sun, wind, or fossil

6 | fuels.

7 |     Q.   How long has the company existed?

8 |     A.   I've been with it about three years.

9 |     Q.   During that period of time, did you have occasion

10 | to employ Dennis Danzik?

11 |     A.   Yes, I did.

12 |     Q.   Were the prerequisites to his employment?

13 |     A.   There were.  Actually, I have -- after all of this

14 | started, I actually had to terminate him until I personally

15 | went through the audits of the financials.  I can tell you it

16 | was 168 pages.  I read them, and I re-engaged him.

17 |     Q.   You re-engaged him because you felt it was safe to

18 | do so?  Is that what you're telling me?

19 |     A.   Yes.  It satisfied my mind.  I was only interested

20 | in the issues that were prevailing without fact to the

21 | shareholders and the investors of the company.

22 |     Q.   The company is publicly --

23 |     A.   No, it's not.

24 |     Q.   It is privately owned at this point in time?

25 |     A.   Yes.

**68**

1      Q.   You said you were concerned about private

2  investors.  Have you had to represent your findings to your

3  investors to keep everybody happy?

4      A.   Many times.

5      Q.   Okay.  Who paid for the audit?

6      A.   I did.

7      Q.   So you are very familiar with the 168 pages.

8      A.   I guess I am.

9      Q.   And you can tell me here today you're pretty sure

10  Dennis Danzik didn't steal anything?

11      A.   I can tell you from what I read, they would still

12  owe him money.

13      Q.   How much money do you suppose he might be owed?

14      A.   I would guess in the range of probably $100,000.00

15  to $150,000.00.  The expenses that were not claimed, as an

16  example.

17      Q.   And that would be money owed by Ridgeline?

18      A.   I don't know who it would be owed by, honestly.

19      Q.   Okay, thank you.

20      A.   You're welcome.

21      MR. HUNSICKER:  Just a couple of questions, Your

22  Honor.

23                    CROSS-EXAMINATION

24  BY MR. HUNSICKER:

25      Q.   It's Mr. Hinz, is that correct?

**69**

1     A.    Yes, thank you.

2     Q.    Thank you.  Mr. Hinz, as you indicated, you're the

3 chairman and CEO of Inductance?

4     A.    That's correct.

5     Q.    When was Inductance formed?

6     A.    Before my time.  It was formed -- so I can't give

7 you the exact date, but I would guess -- well, actually

8 that's not true.  I started with what's called Wyl.

9     Q.    Okay.

10    A.    And then it became Inductance.  So that's probably

11 in 2017.

12         THE COURT:  Can you spell both of those entities

13 for me?

14         THE WITNESS:  Inductance is I-n-d-u-c-t-a-n-c-e.

15 Inductance Energy.  And Wyl is just W-y-l.

16    BY MR. HUNSICKER:

17    Q.    And you're the chairman and CEO of Inductance?

18    A.    I am.

19    Q.    And the W-y-l company, were you the chairman and

20 CEO of that entity, as well?

21    A.    That company -- it was before my -- I'm not sure

22 when I started -- when that started.  But, yes, I acted as

23 the chairman and CEO.  Yes.

24    Q.    Did you form this W-y-l entity?

25    A.    I did not form it.

70

1     Q.   Okay.  Was it an operating entity before you got

2  involved with W-y-l?

3     A.   It was.

4     Q.   Okay.  And what sort of business was W-y-l

5  involved in?

6     A.   It was a technology company.

7     Q.   Okay.  Did W-y-l merge into Inductance?

8     A.   No.  The technology was transferred.

9     Q.   Okay.  So W-y-l owned technology?  Is that your

10  testimony?

11     A.   It owns the technology.

12     Q.   Okay.

13     A.   Yes.

14     Q.   And then it transferred that technology to

15  Inductance?

16     A.   That's correct.

17     Q.   Okay.  Was Mr. Danzik involved in W-y-l?

18     A.   I think early on, but that was before my time.  So

19  I couldn't tell you honestly what he did there.

20     Q.   When did you become involved in W-y-l?

21     A.   I think it was in October of 2017, around that

22  time.

23     Q.   Okay.  What were you doing before then?

24     A.   I was chairman of another company.

25     Q.   What was the name of that company?

1       A.    Easy Energy Systems.

2       Q.    Where is --

3       A.    Well, it was actually two.  There's another

4  company called Trailer Pro Technologies.

5       Q.    Was Mr. Danzik involved in any of those entities?

6       A.    No.

7       Q.    When did you meet Mr. Danzik?

8       A.    I met him with -- let's see, it was during the

9  Trump presentation in Arizona, so when would that have been?

10  Early 2017, I guess.  I'm not sure exactly.

11      Q.    And then did you -- was it through your connection

12  with Mr. Danzik that he became involved in Inductance?

13      A.    In a sense, yes.

14      Q.    Okay.  How many shareholders does Inductance have?

15      A.    About 150 or so.

16      Q.    Okay.  Is Mr. Danzik one of those shareholders?

17      A.    No, he's not.

18      Q.    Any of his family members?

19      A.    I believe some of his family may be, yes.

20      Q.    Okay.  Do you know how they --

21            MR. MCCARTNEY:  This is beyond the scope of

22  direct.  We're on a Rule 69 hearing here.

23            MR. HUNSICKER:  I would disagree, Your Honor.  I

24  think that Mr. McCartney was asking him about Mr. Danzik's

25  character, and I'm trying to get into that character with his

**72**

1   connections to Mr. Danzik and if those connections are

2   questionable or not questionable.

3            I've got questions as to how Mr. Danzik's family

4   members are now shareholders of Inductance, and I think that

5   this gentleman can answer those questions considering he's

6   the chairman and CEO.

7            THE COURT:  I'll give you a little leeway, but

8   stay on point.

9            MR. HUNSICKER:  Okay.

10       BY MR. HUNSICKER:

11       Q.   Do you know how Mr. Danzik's family members

12  acquired ownership in Inductance?

13       A.   I do not.

14       Q.   Was it -- were you the chairman and CEO when that

15  happened?

16       A.   I was not.

17       Q.   Okay.  So it's your understanding that his family

18  members had an ownership interest in Inductance before you

19  became involved?

20       A.   That's true.

21       Q.   Do you know the extent of these stock interests

22  owned by family members?

23       A.   No, not in total.  I do not.

24       Q.   Okay.  Who is the registered agent for Inductance?

25       A.   I'm not sure who the registered agent is for

**73**

1  Inductance.

2       Q.   Okay.  All right, thank you.

3          MR. HUNSICKER:  No further questions.

4          THE WITNESS:  You bet.

5          THE COURT:  Okay.  Any re-direct, Mr. McCartney?

6          MR. MCCARTNEY:  No, thank you, Your Honor.

7          THE COURT:  Okay, thank you.

8          THE WITNESS:  You bet.

9          THE COURT:  Mr. McCartney?

10          MR. MCCARTNEY:  Could we have about a 5-minute

11  recess, and then we'll proceed with one more witness?

12          THE COURT:  Sure.

13          THE COURT CLERK:  All rise.  Court is in recess.

14               (Brief recess)

15          THE COURT CLERK:  All rise.  Court is in session.

16          THE COURT:  Thank you.  Please be seated.

17          Mr. McCartney?

18          MR. MCCARTNEY:  Thank you, Your Honor.  Debtor

19  will call Dennis Danzik.

20          THE COURT CLERK:  Do you solemnly swear, under the

21  penalty of perjury, that the testimony you're about to give

22  in this matter now before the Court is the truth?

23          MR. DANZIK:  I do.

24          THE COURT CLERK:  Thank you.

25      Whereupon,

1                     DENNIS MEYER DANZIK

2          was duly sworn.

3              THE COURT CLERK:  Have a seat.

4                     DIRECT EXAMINATION

5          BY MR. MCCARTNEY:

6          Q.   Please state your full name, please.

7          A.   Dennis Meyer Danzik.

8          Q.   Mr. Danzik, are you the Debtor in this Chapter 7

9     proceeding?

10         A.   I am.

11         Q.   In fact, you've been the Debtor in a lot of

12    bankruptcies?

13         A.   Two prior to this one, yes.

14         Q.   What are you trying to accomplish with this?

15         A.   To give myself enough time and leeway to prosecute

16    the lawsuit in Canada, and basically to get to a point where

17    I can get a fresh start once I prosecute that case.

18         Q.   Tell me about the lawsuit in Canada.

19         A.   It's a substantial lawsuit that's been going on

20    since 2014, that has been fought very hard and heavy by the

21    attorneys by Slamstone (ph) and another law firm out of

22    Canada.

23              And it has reached the point now where it's in a

24    point where they're about to schedule a trial, rule on

25    discovery against Slamstone, the law firm in Canada, and a

1  anti-injunction suit that we filed.

2      Q.   And you say "we."  Who are the parties in the
3  lawsuit?

4      A.   The party in the lawsuit is RDX Technologies
5  Corporation versus the sellers of the refinery, which are as
6  a whole called CWT parties.

7      Q.   And what is the lawsuit -- what transgression are
8  you trying to redress?

9      A.   They basically sold us a $30 million dollar
10  refinery that doesn't refine.  It was originally built in
11  2004 at a cost of about $41 million dollars.  It was in a
12  bankruptcy prior to us buying it, several years prior.  It
13  was offered to us as an IRS/EPA approved facility, and we
14  bought it in March of 2013.

15      Q.   And we have an exhibit, the unit purchase
16  agreement that was the underlying contract for that property,
17  is that correct?

18      A.   That's correct.

19      Q.   And where does that agreement say the choice of
20  law and jurisdiction for litigating a dispute lies?

21      A.   The exclusive venue is Alberta, Canada.

22      Q.   And where is this lawsuit you're talking about
23  pending?

24      A.   Alberta, Canada.

25      Q.   Now, you're almost -- I know you're an engineer.

 1  You're almost becoming a lawyer hanging around with us guys,

 2  isn't --

 3       A.   Possibly.

 4       Q.   Can you tell this Court what the difference in

 5  Canada and the United States is relative to the concept of

 6  *res judicata*?

 7            MR. HUNSICKER:  Objection.  Your Honor, he's not a

 8  lawyer.

 9            MR. MCCARTNEY:  Well, the man knows.  He's paid a

10  fortune to find out.

11            THE COURT:  It's still a legal conclusion that

12  he's not in a position to draw.

13       BY MR. MCCARTNEY:

14       Q.   Is the New York case barring your prosecution in

15  Canada?

16       A.   No.  The default judgments against myself and RDX

17  are not being honored in Canada.

18       Q.   What do you think the case is worth?

19       A.   Again, I don't know how in Canada, or for that

20  matter in the United States.  The time I've been in my

21  courtroom in my entire life other than in New York for a

22  couple of days, I would say the total damages to RDX are

23  probably in excess of $90 million dollars.  That's not

24  including it's market cap at the time.

25            As far as myself personally and my Estate,

1  promissory notes that are -- were executed by the company in

2  my favor for approximately two-and-a-half million dollars,

3  the expenses of a couple hundred thousand dollars, and I'm

4  entitled under my contract with RDX, I believe, to 20 percent

5  of the process of the lawsuit.

6      Q.   Are you not also entitled to indemnification by

7  RDX?

8      A.   I am.

9      Q.   That would mean only attorneys' fees you've paid

10  in three bankruptcies, among other things?

11      A.   That is correct.

12      Q.   And you actually hold promissory notes from RDX?

13      A.   Both my wife and I do.  But, yes, I hold the

14  majority of them.

15      Q.   And approximately what is the face amount of these

16  notes?

17      A.   There's just under two-and-a-half million dollars.

18      Q.   If RDX collects in the Canadian litigation, it

19  would be funded to pay the notes?

20      A.   That's correct.

21      Q.   And money would be available to your Chapter 7

22  Trustee?

23      A.   Yes.

24      Q.   You're aware that in Chapter 7 he gets the note?

25      A.   I'm fully aware of that.

1        Q.    He probably would pay the creditors off and give

2   you back some change, wouldn't he?

3        A.    I would have my entire tax bill paid, and

4   creditors would get redress.  Yes.

5        Q.    And in addition to the promissory notes the RDX

6   company owes that are the subject matter of litigation, were

7   there any other hard assets on hand the day this Petition was

8   filed?

9        A.    Yes.  My personal possessions that I listed on my

10  Schedules.

11       Q.    "My personal possessions" include two Bat Mobiles

12  probably worth hundreds of thousands of dollars?

13       A.    Yeah, they are.  They are -- both cars would

14  probably appraise today at close to a million dollars.

15       Q.    Those are exempt to the extent of $5,000.00 in the

16  State of Wyoming.  What's the value of that property even

17  being available for?

18       A.    Creditors.

19       Q.    Now, you remember what creditor is?

20       A.    The IRS.

21       Q.    You understand that, but you have other creditors?

22       A.    Yes, I do.

23       Q.    How is the Canadian litigation being funded?

24       A.    Currently right now, Mr. Hinz stepped in.  Once he

25  read the entire case file, which took about nine months, I

**79**

1  also agreed to go through a full forensic audit.  Not only

2  myself, my wife.  That took approximately seven months.  And

3  after that, he agreed that he would indemnify me as part of

4  my employment agreement with the company.

5       Q.   So you have every reason to believe you're well

6  represented in Canada?

7       A.   Very well represented, yes.

8       Q.   And we're in late stages of discovery, is that

9  accurate?

10      A.   We are waiting on a ruling for us to have

11  discovery against the law firm of Schlam Stone Dolan,

12  particularly Mr. Jeffrey Highlander.

13      Q.   And your engineering and forensics with respect to

14  the refinery have long been accomplished?

15      A.   That's correct.

16      Q.   You won't have any trouble -- strike that.  Is

17  there an expert available for you to produce in that purpose?

18      A.   We employed two experts on the refinery.  The

19  refinery was built in 2004 at a cost of just a little over

20  $40 million dollars.  And they've both rendered opinions

21  which are in the documents that were put into evidence today.

22  I believe they're in these binders.

23           And those basically state that it doesn't work.

24  And also the deposition testimony of the CWT parties itself,

25  John Nolton and Bruce McFarlane, identified in their

1   testimony that the refinery didn't work.

2        Q.   After you abandoned the refinery, you gave up on

3   it -- RDX did?

4        A.   Yes.

5        Q.   You've got two and a half acres with $46 million

6   dollars worth of improvements.  Did the CWT parties come back

7   in and open the doors?

8        A.   That was very telling.  After we told them that we

9   were not going to pay for the refinery, that was the telling

10  thing.  They walked away from it.  They never tried to go

11  back at all, which tells you the true value of that refinery.

12       Q.   Wouldn't you think there is -- if it cost $46

13  million to build, millions of dollars worth of salvage, if

14  nothing else?

15       A.   The stainless columns in that refinery alone,

16  scrap value would probably be, even in today's market, $5 to

17  $8 million dollars after the labor to take it down.

18       Q.   Who owns the real estate on which the refinery

19  sits?

20       A.   The real estate underneath it was owned by

21  Butterball, and was leased to the refinery on a very, very

22  long-term lease.  I believe 20 years.  And Butterball

23  controls the underlying ground to the refinery.

24            There is another piece of real estate that is

25  owned by the refinery to the west, approximately -- I believe

1   it was five acres that was owned free and clear by the

2   refinery itself.

3        Q.   And under the terms of the UPA, that would have

4   reverted to the CWT parties?

5        A.   That's correct.

6        Q.   Okay.  And do you know if anything is happening

7   there now at all?

8        A.   They have not touched it.

9        Q.   Dennis, is your estate going to be an asset

10  estate?

11       A.   There is substantial assets in my estate, yes.

12       Q.   What did we think the IRS priority claim was when

13  you filed the Chapter 7?

14       A.   What they had filed was a couple hundred thousand

15  dollars.  I literally work with the IRS every week, and so I

16  knew what the number would probably be at least around

17  $750,000.00, if not more.  So I just started piling my

18  earnings into a tax account.

19       Q.   Okay.  If your Trustee liquidates Bat Mobiles and

20  RDX promissory notes and the cash on-hand, is there any doubt

21  in your mind that the IRS is going to get paid?

22       A.   No.  I had almost $400,000.00 in my tax account

23  after paying all of my withholding out of my pay checks for a

24  little over a year, plus about $138,000.00 in my DIP account.

25       Q.   Okay.  Have you bought and sold Bat Mobile quality

1  motor vehicles before?

2      A.   Yes, I've had car collections ever since I was in

3  my mid-20s.

4      Q.   Do you have any other interesting cars?

5      A.   No.   That one, Bill loaned me some money for --

6  quite a while ago, and paid the note off.   So that actually

7  is his.

8      Q.   So you actually sold that?

9      A.   Well, yeah.   He actually paid the note off and I

10 could not afford to pay the note off at the time.   That was

11 prior to my first bankruptcy.

12     Q.   What was significant about that car?

13     A.   It's a Starsky & Hutch car.

14     Q.   The television show Starsky & Hutch?

15     A.   Yes.   I bought that from --

16     Q.   When you say you've got a hundred thousand dollar

17 or million dollar Bat Mobiles, you're familiar that quality?

18     A.   I bought and rebuilt those cars myself.   I put

19 myself through school as a diesel mechanic, and I'm very

20 familiar with cars.   It's a hobby.

21     Q.   And you're confident that your testimony with

22 respect to their value today?

23     A.   Yes.

24     Q.   What do you expect to get out of this bankruptcy?

25     A.   I want to get my debts paid, as I did when I was

1 in Chapter 11, and get on with my life.  Get the "fresh

2 start."  I feel that I'm entitled to that, and nothing I've

3 done shows otherwise.

4      Q.    It's alleged in the motion that we're here for

5 today that you are a genius or that you have a desire to work

6 havoc with your creditors.  Do you feel that you're out to

7 get somebody?

8      A.    Not at all.  I have been a person with large debt

9 in my adult life.  I've always had excellent credit up until

10 this instance.  And if it's found at the end of the trail

11 that the judgment stands, the default judgment stands for

12 some reason, then I'll have to deal with that.

13         But right now, I should be able to litigate

14 through it, because they owe me a lot of money.  I don't

15 believe that I owe them money.

16      Q.    And it's real.  You've been in court almost four

17 years now, haven't you?

18      A.    Since August of 2014.  Almost five years.

19      Q.    Any challenges pending relative to jurisdiction,

20 based on the contract?

21      A.    No.

22      Q.    You're in the right place to get a final decision?

23      A.    We are.

24      Q.    Have you been able to tell your story before now?

25      A.    This is the first time this evidence has been in

1  an open courtroom.  Mr. Highlander, my former attorney that

2  turned around and sued me in the same matter, and also paid a

3  very heavy bribe to our former CFO.  She actually testified

4  against me in New York after being offered more than a

5  $100,000.00 a year job.  That's when she recanted and then

6  said that I had stolen this tax credit money, which is

7  completely untrue.

8       Q.    That was the subject matter of the forensic audit?

9       A.    That's correct.  I did go through that, yes.

10           MR. MCCARTNEY:  Just a second, Your Honor.

11      (Pause)

12           MR. MCCARTNEY:  That's all I have.

13           THE COURT:  Mr. Hunsicker?

14           MR. HUNSICKER:  Just a few questions here.

15                     CROSS-EXAMINATION

16  BY MR. HUNSICKER:

17      Q.    Mr. Danzik, are you currently employed by

18  Inductance?

19      A.    I am.  I do work there.  I do not have a current

20  contract.

21      Q.    Do you get paid to work there?

22      A.    I haven't taken a pay check out of Inductance

23  since the middle of January of this year.

24      Q.    And why is that?

25      A.    I want to see how all of this works out, because I

1  do not want to be a burden to that company or the

2  shareholders.

3        Q.   When did you become involved with Inductance?

4        A.   When it was formed in 2017.

5        Q.   Were you part of that formation?

6        A.   What do you mean by that?

7        Q.   Did you decide to incorporate this entity?

8        A.   No.

9        Q.   No?

10       A.   It was to be a licensee of the intellectual

11  property company which is called Wyotech Investments (ph).

12       Q.   Do you know how your children became shareholders

13  in Inductance?

14       A.   Neither one of my kids are shareholders in

15  Inductance.

16       Q.   Okay.  All right.  So do you -- are you saying

17  that Mr. Hinz was then incorrect when he said that you have

18  family members that were shareholders?

19       A.   I have an uncle that lives in Albuquerque that

20  originally put in money into Wyotech to help get it going.

21       Q.   Okay.  So just your uncle, then, has an interest I

22  n Inductance?

23       A.   Very small.  He doesn't have any interest in

24  Inductance.  At that time, all they were offering was

25  membership in Wyotech.  Inductance hadn't even been thought

1  of at that point.

2      Q.    Does your uncle have a membership interest or

3  stock interest in Inductance today?

4      A.    No.

5      Q.    No?

6      A.    No, not to my knowledge.  I don't think he was in

7  at that time when they granted stock in Inductance.

8      Q.    Can you help me clear up the confusion?  I believe

9  Mr. Hinz's testimony was that certain of your family members

10  are shareholders in Inductance.

11      A.    Well, my uncle I consider a family member, and he

12  did invest early on.  I think he --

13      Q.    Is he a shareholder?

14      A.    -- put in $15,000.00, or something.

15      Q.    Is he a shareholder today?

16      A.    He's in Wyotech as a member, which is an LLC.

17  Inductance is a separate company.

18      Q.    Okay.

19      A.    That is the master licensee of the intellectual

20  property that Wyotech owns.

21      Q.    Okay.  Again, Mr. Hinz testified your family

22  members are shareholders in Inductance.  Was that a true

23  statement?

24      A.    Not that I'm aware of.  I don't know if he got

25  granted shares at that time, or not.

1        Q.   Okay.

2             MR. HUNSICKER:  No further questions, Your Honor.

3             THE COURT:  Thank you.  Mr. McCartney, any re-

4    direct?

5             MR. MCCARTNEY:  I don't believe so, Your Honor.

6    Thank you.

7             THE COURT:  Okay.  Thank you, Mr. Danzik.

8             THE WITNESS:  Thank you.

9             THE COURT:  Anymore witnesses?

10             MR. MCCARTNEY:  No, Your Honor.

11             THE COURT:  Okay.  Any rebuttal evidence?

12             MR. HUNSICKER:  No, Your Honor.  But we would like

13    a couple of minutes for closing.  Can we go straight into

14    closings?

15             THE COURT:  Okay.  Mr. Hunsicker?

16             MR. HUNSICKER:  Thank you.  Your Honor, the CWT

17    parties are here today filing a motion to dismiss the

18    Debtor's third bankruptcy, for cause, under Section 707(a) of

19    the Bankruptcy Code.

20             Section 707(a) has certain enumerated grounds that

21    demonstrate what is cause.  Those grounds are merely

22    illustrative.  They are not an exhaustive list.

23             As the briefing before the Court shows, we are

24    relying heavily on the fact that this case was filed in bad

25    faith.  And that bad faith does count as sufficient cause to

1  dismiss under Section 707(a).

2          When we look at bad faith, it's determined by

3  reviewing the totality of the circumstances surrounding the

4  case.  We look to see if there is any sort of pre-Petition

5  conduct that would give rise to a bad faith filing, the pre-

6  Petition conduct is relevant, and the pre-Petition conduct

7  would include any sort of past bankruptcy filings.

8          So from a very high level, it really boils down

9  to:  Has there been a misuse or abuse of any provisions or

10 the purpose or the spirit of the Bankruptcy Code with respect

11 to the filing?

12         Certain courts look to a 16-factor test to

13 determine if bad faith exists.

14         As the briefing shows, we believe that several of

15 those factors demonstrate bad faith.

16         The first factor that we rely on is whether

17 Debtor's manipulations have the effect of frustrating one

18 particular creditor.  I think this Court is painfully aware

19 of what the CWT parties have been through with litigating

20 with Mr. Danzik.

21         The Debtor's sole purpose through his bankruptcy

22 filings is really just to prevent the CWT parties from ever

23 collecting on their judgment, or ever really determining what

24 happened to the monies that Mr. Danzik embezzled from them.

25         So, did his manipulations have the effect to

1 │ frustrate one particular creditor?  Of course.  I don't think
2 │ that we can contest that.

3 │         The second factor:  Whether there is an absence of
4 │ an intent to pay creditors.

5 │         To look at these serial cases, this is the third
6 │ case, the prior two Chapter 11 cases were pending for roughly
7 │ two and a half years.  Not once did we ever see a Plan get
8 │ filed in those Chapter 11 cases.  The Debtor sat on his hands
9 │ for two and a half years, never once proposed any sort of
10 │ repayment plan.

11 │         Was there ever an attempt to pay creditors?  No.
12 │ And rightfully so, because, as this Court found, the Debtor
13 │ has very little-to-no unencumbered assets that would actually
14 │ pay anybody money.

15 │         Yes, he has assets, but yes he has significant
16 │ secured tax debt that's going to eat up any sort of value
17 │ that might ever go to unsecured creditors.

18 │         So we do believe that there has been serious
19 │ attempts to not pay his debts.

20 │         The third factor is:  Whether the Debtor is over-
21 │ utilizing protections of the Code to the detriment of
22 │ creditors.  It's silly to even have to go through this
23 │ factor.

24 │         Three filings in three years, without creditors
25 │ getting one dollar.  If this is not over-utilization of the

1  Code, then really nothing could ever be over-utilization of

2  the Code.  He's had three years to sit and do nothing to pay

3  his debts that he owes.

4       The fourth factor that's in our favor is:  Whether

5  the Debtor filed the bankruptcy in response to a judgment.

6  And the Debtor makes no issue that this latest filing was the

7  result of CWT's collection efforts against him.  There is

8  absolutely no dispute.

9       The CWT parties restrained monies in an account in

10  New York.  The Debtor ultimately filed.

11       And there's a question about those monies.  We

12  don't necessarily think that those monies belong to Mr.

13  Danzik.  We have serious concerns that those are either the

14  embezzled monies from the CWT parties, or they are proceeds

15  or products from the embezzled funds.

16       In either of those two scenarios, they would never

17  be property of the Estate.  So to the extent that this Court

18  does keep this case in Chapter 11, what the Court is really

19  inviting is more litigation, but now it's going to be between

20  the CWT parties and maybe other creditors or the Chapter 7

21  Trustee, about whose money this really is and where it should

22  go.

23       The next factor is:  Whether there's been a

24  deliberate and persistent pattern of evading a single major

25  creditor.

**91**

1          When we look at everything, we have litigation in
2    Canada, we have litigation in New York, we have litigation in
3    Arizona, we have litigation in Wyoming.   Throughout all of
4    this litigation, there has been multiple filings, multiple
5    discovery disputes, multiple requests to amend orders, to
6    vacate orders.

7          And now we have an appeal that is before the
8    District Court here in Wyoming.

9          So there should be little-to-no question that the
10   Debtor is using the court system to evade collection efforts
11   at every little turn.   We run into road blocks.   We run into
12   a new bankruptcy.   It is a persistent pattern of evasion.

13         The next factor is whether there have been
14   multiple filings or other procedural gymnastics.   And this is
15   just the general thing that I'm talking about.   Multiple
16   filings, multiple reconsideration of orders, motions to
17   vacate orders that have been sitting for very extended
18   periods of time, taking advantage of the appeal process,
19   staying cases, filing bankruptcy, trying to use the automatic
20   stay as a sword.

21         And let's just for a minute talk about the
22   adversary case where this Court found that the New York
23   judgment was non-dischargeable.   When we were at that
24   hearing, and I believe it was a telephone hearing, Mr.
25   McCartney acknowledged that if that judgment stood, that

1 everybody was bound by collateral estoppel and issue

2 preclusion that that judgment would last.  It would stand.

3       And for that reason, the Court would almost be

4 obligated to award the non-dischargeable judgment.  Mr.

5 McCartney indicated he had no defenses.  If the New York

6 Court did what it did, said the judgment was final, that was

7 it.  The adversary was going to be found in the CWT parties

8 favor, and that's what happened.  We still see an appeal of

9 that order.

10       So it's concerning.  It doesn't matter what they

11 say.  It just matters what they do.  And what they do is they

12 evade.  He evades everything that we've ever tried to do, and

13 right when we get close to something, discovery or otherwise,

14 we see a bankruptcy filing.

15       To rebut the bad faith, the Debtor's brief simply

16 states "well, bad faith can never be cause to dismiss."

17       But if you actually look at the authority, there

18 is a split.  There's absolutely no controlling law from the

19 Tenth Circuit Court of Appeals that the overwhelming majority

20 of courts have found that bad faith can constitute cause

21 under 707(a).

22       As the briefing outlines, the Third Circuit, the

23 Sixth Circuit, the Eighth Circuit, and the Eleventh Circuit,

24 have all found that bad faith is cause, or can be cause,

25 under 707(a).  The Ninth Circuit is different.  There is one

1 | outlying surprises to the Ninth Circuit.

2 |         When we look at this body of case law, and as the

3 | briefs indicate, there are quite a few courts within the

4 | Tenth Circuit that have determined that bad faith is cause

5 | under Section 707(a).  And so when we look at the case law

6 | and we look at those courts that say "yes, bad faith can be

7 | cause," there are some courts that take a narrow

8 | interpretation and say "but, it's not just bad faith in the

9 | sense of bad faith.  It's a heightened standard.  You have to

10 | show a scorched earth tactic against a diligent creditor."

11 |         That's basically the test, the most stringent

12 | test, that courts will look at.  And so do we have a scorched

13 | earth tactic against a diligent creditor?  Yes, we do.  I

14 | don't think there can be any questions that the earth is

15 | scorched.  We have been fighting with Mr. Danzik and his

16 | bankruptcy filings for now three years.

17 |         Apart from the factors that can establish bad

18 | faith and cause under 707(a), as the briefing points out,

19 | that where the purpose of the case is inconsistent with the

20 | purpose of Chapter 7, which is to pay creditors and provide

21 | the Debtor with a fresh start, the Court should dismiss the

22 | matter.

23 |         In this case, the Court has already found that

24 | there are very few, if any, assets available for unsecured

25 | creditors.  And that was just, what, a couple of months ago

**94**

1   the Court made that determination.

2            And now we come in here today and we hear about

3   RDX, who filed Chapter 11 in Arizona.  The case was

4   dismissed, with prejudice.  That company has got these great

5   clients, and it's going to pay Mr. Danzik a ton of money

6   through these promisory notes that we did not see here

7   today.

8            It is smoke and it's mirrors.  It does not exist.

9   It's not real.

10           There are few, if any, assets available to pay

11   unsecured creditors in this case.  The big beneficiary here

12   would be the IRS, but that is only to the extent that the

13   Chapter 7 Trustee really wants to administer the case for the

14   benefit of one creditor.

15           On top of the minimal assets, there is a $7

16   million dollar non-dischargeable debt against Mr. Danzik.  I

17   am almost certain that that will hold on appeal, and for that

18   reason there will be no fresh start for Mr. Danzik.  That

19   judgment is going no where.

20           The cases cited in the brief indicate that where

21   the purpose of Chapter 7 has thwarted, because there will be

22   no fresh start, the case should be dismissed because it

23   serves no purpose other than delay.

24           We've had three years of delay.  We're asking this

25   Court to give us some room so that we can try to maneuver, do

**95**

1   our discovery, complete some litigation, and try to make some
2   headway.  We ask that we not be delayed further.

3          In recently dismissing the prior case, the Court
4   determined that the dismissal was in the best interests of
5   all creditors.  And we believe that dismissing the same case,
6   this new case, is the same thing.  It's in the best interests
7   of all creditors.

8          But allowing Chapter 7 relief now, when the Court
9   just denied it recently, saying "that's not in the best
10  interests of creditors," that renders this Court's ruling
11  completely meaningless.

12         It seems odd that the test is "what's in the best
13  interests of creditors?  Is it dismissal, or is it
14  conversation?"  And if you find dismissal, well, the Debtor
15  can just turn around and file a new Chapter 7 case.  Why even
16  have this test look to "well, what do creditors want?  Do you
17  want dismissal or conversion?"

18         If it was this easy, why isn't the test "ask the
19  Debtor what he wants.  Do you want this case dismissed, or do
20  you want conversion?"  And that's not the test.

21         So this Court found it was in the best interests
22  of all creditors to keep Mr. Danzik out of Chapter 7, and
23  that's all we're trying to do here today.

24         The last argument presented in the brief is that
25  *res judicata* should bar Chapter 7 relief to Mr. Danzik.  This

1  Court has already determined that dismissal was appropriate

2  relief and that Chapter 7 relief was not.

3          And when we filed the motion to dismiss in the

4  prior case, no creditors urged for conversation, and Mr.

5  Danzik did not urge for conversion.  Anybody could have done

6  it in that proceeding, and they didn't.  They should be

7  barred from seeking that relief today.

8          And it is important because we're here in a

9  Chapter 7 case where the Debtor is saying "I'm going to pay

10 creditors," yet there are no creditors here saying "keep him

11 in bankruptcy.  We want to get paid."

12         Instead, the only creditor that has shown up is

13 the CWT parties saying "please make this case go away."

14         And then we have testimony from professionals,

15 from apparently across the country, for some reason want to

16 keep Mr. Danzik in bankruptcy.  It seems somewhat

17 questionable why they want their business partner to remain

18 in bankruptcy.  Maybe because some of these folks are subject

19 to discovery and other related matters?  I don't know.

20         But it seems highly questionable that they think

21 that Mr. Danzik should stay in bankruptcy.  They are not

22 creditors.

23         Lastly, we've asked for a 180-day bar to re-

24 filing.  We're asking that the case be dismissed, with

25 prejudice, and that Mr. Danzik be barred from re-filing for

**97**

1  180 days.

2          Under 11 U.S.C. 349, the Court, for cause, can bar

3  the Debtor from making a subsequent bankruptcy filing if

4  cause is established, looking at two factors:

5          The first is bad faith.  Has there been a pattern

6  of evasion shown through multiple filings.  I think that's

7  pretty accurate here to say "yes, there has been a pattern of

8  evasion shown through multiple filings."

9          And the second:  Has there been conduct abusive or

10 prejudicial to creditors?  And the test for that is would

11 denying -- is there denying opportunity for a creditor to

12 exercise rights because of the automatic stay.

13         Well, because of the automatic stay, our hands are

14 tied.  As soon as our hands are untied and we make progress,

15 they get tied again with the automatic stay.

16         The Debtor has deliberately violated orders in New

17 York.  He's been found to have committed fraud on the Court,

18 to have lied under oath, to coerce a witness to perjure

19 themselves, and found to have altered documents.

20         On top of all of that, there's been absolutely no

21 attempt to pay creditors.

22         So we believe that the Debtor's conduct

23 exemplifies a willful disregard of the legal system, and it

24 misuses this Bankruptcy Court.

25         He has enjoyed the stay for nearly three years.

1  The sole purpose has been delay.  He's manipulated the

2  system, and he has used the automatic stay as a shield to

3  protect himself.

4        We're ask that the shield be stripped from him,

5  that the case be dismissed.

6        Thank you, Your Honor.

7        THE COURT:  Thank you.  Mr. McCartney?

8        MR. MCCARTNEY:  I will call the Court's attention

9  again to the Colorado District Court case on dismissal of the

10 Chapter 7.  I think it's relevant.  I think it's extremely

11 well reasoned.

12        Let's talk about Mr. Danzik's bad faith.  The

13 Courts did find bad faith cause for the dismissal of a

14 Chapter 7.  I've come up with 16 factors that should be

15 considered in making a decision in that regard.

16        And the Movant here argues, somewhat weakly, 6 of

17 the 16.

18        Let's not look at the factors.  Let's look at what

19 the testimony was.  The only testimony, it's unrefuted, that

20 Mr. Danzik thinks he can pay his creditor.  This is going to

21 be an asset case.  A substantial asset case, easily the

22 potential of paying all of the creditors.

23        You don't sell somebody a refinery for $30 million

24 dollars and not have it refine, and walk away from that.  And

25 it's significant because the $7 million dollar claimant that

1   has spent a literal fortune scorching the earth and chasing

2   Mr. Danzik the last three or four years, in an effort to keep

3   him from prosecuting that Canadian case, is in the position

4   where a setoff could exist if that decision comes down and

5   the refinery not working in his favor.

6               In all of the evidence, you've never ever heard

7   the CWT parties suggest that it was a refinery.  Only that

8   they've talked the New York Court into a default judgment as

9   a discovery sanction.  That's what we hear from the CWT

10  parties.

11              You have appointed one of the better Trustees in

12  the country, certainly in this District, Randy Royal.  He is

13  aware that there was cash on the Petition date.  He's equally

14  aware that there are large dollar collectibles and some very

15  interesting litigation ongoing in favor of a company with two

16  promissory notes owing Dennis a little over two-and-a-half

17  million dollars.

18              I don't know how the Court could make a finding

19  without the only evidence in front of it that this isn't a

20  substantial Estate, and that this isn't a good faith effort

21  to make those assets available for an orderly liquidation of

22  the Debtor's affairs, in order to enable a fresh start.

23              There is nothing about that that is bad faith.

24  It's ludicrous to think that a decision in the Chapter 11

25  that you're not going to convert would have a bearing on a

1  future Chapter 7.  If it were the case that a Chapter 11

2  dismissal, maybe you couldn't file Chapter 7 any time in your

3  life in the future, it would have been really easy to put

4  that in the Bankruptcy Code.

5           There is nothing in the Code or Rules.  There's

6  nothing in the Code or Rules about three filings.  There is

7  law that says it can't be done in bad faith.  We look to the

8  reason and what's going on.  Is there an effort being made

9  here today to liquidate assets to pay creditors?  And the

10 answer is yes.

11          The second Chapter 11 was moving along pretty

12 well, too, at about $600,000.00 in the bank to deal with

13 creditors.  The Court chose to dismiss without contest from

14 the Debtor, and that's how that is.

15          But the Debtor would still like the opportunity

16 that Chapter 7 presents, and is here today in good asking you

17 to allow that to happen.  It certainly is within your

18 discretion.

19          Thank you, Your Honor.

20          THE COURT:  Thank you.  Thank you for your

21 testimony.  I'm glad we could provide a nice somewhat summer

22 day.  It's probably only about three we're going to have in

23 the next month, I think.

24          MR. HUNSICKER:  I jinxed it.

25          THE COURT:  We're going back to the 50s next week,

1   so you got here on a good week.  It probably feels good to

2   you, since it's probably 100 in Arizona, which I want to go

3   get into.  I'm sick of the cold and rain, and I'm ready for

4   summer.

5          But I appreciate you traveling to be here today.

6          And the Court will take the matter under

7   advisement and issue a decision in writing.

8          Thank you.

9          MR. MCCARTNEY:  Thank you.

10         MR. HUNSICKER:  Thank you.

11         THE COURT CLERK:  All rise.  Court is in recess.

12             (Time noted:  11:58 a.m.)

13               * * * * *

14               CERTIFICATE

15     I, RANDEL RAISON, certify that the foregoing is a

16   correct transcript from the official electronic sound

17   recording of the proceedings in the above-entitled matter, to

18   the best of my ability.

19

20

21   _____       August 12, 2019

22   Randel Raison

23

24

25

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF WYOMING
*Minutes of Proceeding*

| | |
|---|---|
| Date: May 15, 2019 | HONORABLE Cathleen D. Parker, Presiding |
| | Location: Courtroom |

| In re: | | Case No: 19-20116 |
|---|---|---|
| Dennis Meyer Danzik | Debtor(s) | Chapter 7 |

Appearances

| Debtor(s) | Dennis Meyer Danzik | Counsel | Ken McCartney/Dennis Wilenchik |
|---|---|---|---|
| Creditor | CWT Canada II Limited Partnership and Resource Recovery Corporation | Counsel | Brad Hunsicker |

Proceedings:   Evidentiary hearing on CWT Canada II Limited Partnership and Resource Recovery Corporation's Motion to Dismiss Chapter 7 Case, With Prejudice (ECF No. 13),  the Debtor's response (ECF No. 36), and CWT's reply (ECF No. 52)

Witness sworn and testified:   Anthony Ker, William Hinz, Dennis Danzik

The parties' arguments, testimony, and production of documentary evidence is on the record.

Orders:
- ☐ Relief sought ☐ Granted ☐ Denied ☐ Case Dismissed ☐ Continued
- ☒ Matter taken under advisement
- ☐ Formal order or judgment to enter to be prepared by _____
- ☐ These minutes constitute the Court's official order in this matter.

BY THE COURT

5/16/2019

Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming

**103**

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re | ) | |
| | ) | |
| DENNIS MEYER DANZIK | ) | Case No.  19-20116 |
| | ) | Chapter 7 |
| Debtor. | ) | |

### DECISION MEMORANDUM ON
### MOTION TO DISMISS CHAPTER 7 CASE WITH PREJUDICE

CWT Canada II Limited Partnership and Resource Recovery Corporation (CWT Parties)
filed the above-captioned Motion requesting the court dismiss Debtor Dennis Meyer Danzik's
chapter 7 bankruptcy case for cause on the basis Debtor filed this case in bad faith, inconsistent
with the purpose of Chapter 7 and allowing Debtor to proceed renders this court's repeated
decisions on dismissal versus conversion meaningless. Debtor argues bad faith is not cause to
dismiss in a Chapter 7 case and his desire for a fresh start is the reason for filing the Chapter 7
case. The hearing occurred May 15, 2019. The court reviewed the pleadings, testimony and
exhibits and shall grant the Motion.

**Jurisdiction**

This court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and 157. This
is a core proceeding under 28 U.S.C.§ 157(b)(2)(A). Venue is proper under 28 U.S.C. §§ 1408
and 1409. The CWT Parties bring this Motion under 11 U.S.C. §§ 707(a), 349 and 109(f).[1]

**Facts**

Prior to filing his first voluntary petition, Debtor was in litigation with the CWT Parties.
The CWT Parties were Defendants and Counterclaim/Cross-Claim/Third Party Plaintiffs in a
pending action in the Supreme Court of the State of New York, County of New York,
Commercial Division, captioned *GEM Holdco LLC, et. al. v. Changing World Technologies,
L.P., et al.*[2] The cross-claim between CWT Parties and Debtor involved tax credits issued in the
name of Renewable Environmental Solution, LLC, which was under the control of RDX

---

[1]  All future references to "Code," "Section," and "§" are to the Bankruptcy Code, Title 11 of the United States
Code, unless otherwise indicated. All future references to "Bankruptcy Rule" or "Rule" are to the Federal Rules of
Bankruptcy Procedure.
[2]  New York Sup. Ct., Index No. 650841/2013.

Technologies Corporation and controlled by Debtor. On the eve of filing his voluntary Chapter 11 petition on January 4, 2016 (First Case), the New York Court ruled that the tax credits do not belong to Debtor and had held a hearing to address whether it should hold him in contempt. The CWT Parties requested relief from the automatic stay to allow the New York Court to enter its order, which this court granted.[3]

After the court granted relief,[4] the New York court entered its formal entry of judgment fixing liability against Debtor and issued a written contempt decision. Throughout the New York Court proceedings, it found: 1) Debtor ignored countless court orders with absolutely no regard for the court's authority;[5] 2) Debtor was the epitome of a recalcitrant, contemptuous, and incorrigible litigant whose pleadings deserved to be stricken;[6] and 3) the court's sanctions were necessary, "to preserve the integrity of the court."[7] The CWT Parties obtained a judgment in the amount of $7,033,491.13 against Debtor in the New York action.

This court found "cause" to dismiss the First Case under Section 1112(b) based on the following: 1) Debtor was unable to effectuate a plan; 2) there was substantial or continuing loss to or diminution of the estate with no reasonable likelihood of rehabilitation; 3) Debtor failed to meet filing and reporting requirements; 4) Debtor failed to pay taxes; and, 5) Debtor lacked good faith in filing and administering the case.[8] In addition, the court addressed whether dismissal or conversion was in the best interest of creditors and concluded that the case should be dismissed, not converted.[9] Debtor's First Case lasted over fourteen months.

Almost nine-months after the court dismissed the First Case, Debtor filed his Second Chapter 11 petition.[10] The CWT Parties moved to dismiss the Second Case, and after an evidentiary hearing, the Court found cause to dismiss under Section 1112(b)(1).[11] The court found the CWT Parties showed: "Debtor 1) is grossly mismanaging the estate by failing to

---

[3]  *In re Danzik*, Case No. 16-20002 (Bankr. D. Wyo. 2016).

[4]  *GEM Holdco LLC, et al., v. Changing World Technologies, L.P., et al.* (Sup. Ct. N.Y.), Index No.: 650841/2013.

[5]  *GEM HOLDCO, LLC and GEM VENTURES LTD., v. Changing World Technologies, L.P.*, et al, Case No 650841/2103, Doc. No. 926 , p.11  (Sup. Ct. N.Y.: Part 54, February 4, 2019).

[6]  *Id.* at 11 (citing Doc. 614 at 12).

[7]  *Id.* (citing Doc. 597 11/4/15 Tr. at 71).

[8]  See *Order on Sigma Opportunity Fund II, LLC's Motion to Dismiss, In re Danzik*, Case No. 16-20002, Doc. 393 *passim* (Bankr. D. Wyo. March 8, 2017).

[9]  *Id.* at 19.

[10]  *In re Danzik,* Case No. 17-20934 (Bankr. D. Wyo., Dec. 6, 2017).

[11]  See *Decision Memorandum on CWT's Motion to Dismiss, In re Danzik*, Bankr. Case. No. 17-20934, Doc. 201 (Bankr. D. Wyo. February 6, 2019).

timely file monthly operating reports, 2) is not able to effectuate a confirmable plan; and, 3) filed this case in bad faith."[12] In finding Debtor filed the case in bad faith, the court found: "Debtor is using the breathing space to avoid his financial obligations. He has not argued nor demonstrated he is using it to rehabilitate any business."[13] Further, the court quoted its Order dismissing the First Case, concluding "Debtor's circumstances have not changed. The CWT litigation continues, and Creditors' claims are on hold while Debtor parks in bankruptcy."[14]

In its Order dismissing the Second Case, the court again addressed whether dismissal or conversion was in the best interest of creditors and expressly followed the First Case's Dismissal Order:

> CWT requests dismissal rather than conversion. Mr. Danzik's exempt assets would only be available to the IRS and secured creditors, leaving no assets for a trustee to administer. There is no pending litigation that would benefit a Chapter 7 estate. The court applies the same analysis from Debtor's first case:
>
>> It is in the best interest of the estate to dismiss. Any liquidation would be for the sole benefit of the secured creditors. A liquidation bankruptcy case is not administered for the benefit of a debtor's secured creditors but for the benefit of its unsecured creditors.

Thereafter, Debtor filed a Motion for Alteration or Amendment of an Order in the Second Case. Debtor asked the Court to alter its judgment and convert the Second Case to Chapter 7, instead of dismissing it. The Court denied the Motion, stating:

> Debtor never argued for conversion to Chapter 7 liquidation proceedings instead of dismissal before or during the hearing. While Debtor repeatedly asserted creditors would be better served by proceedings in bankruptcy court rather than collection actions in state court, these arguments were brought in the context of his attempts to remain within Chapter 11 proceedings. All creditors had notice of CWT's Motion to Dismiss, yet none contested it or advocated for conversion to Chapter 7, rather than dismissal.[15]

The court dismissed the Second Case but did not close it because the CWT Parties moved for and were granted its request for the pending adversary to proceed to conclusion. The court entered judgment in favor of the CWT Parties in their non-dischargeability claim.[16] The court

---

[12] *Id*. at 15.

[13] *Id*. at 10–11.

[14] *Id*. at 12.

[15] *Order Denying Motion to Alter or Amend Court's Order, In re Danzik*, Case. No. 17- 20934, Doc. 211 at 2 (Bankr. D. Wyo. March 8, 2019).

[16] *Memorandum Decision and Order Granting in Part and Denying in Part, CWT Parties' Motion for Partial Summary Judgment,* Bankr. No. 17-20934, Adv. No. 18-02007, Doc. 38 at 10 (Bankr. D. Wyo. March 18, 2019).

held the $7,033,491.13, judgment obtained against Debtor in New York State Court in *GEM Holdco LLC, et al., v. Changing World Technologies, L.P., et al.,* is non-dischargeable:

> The New York Court held that Danzik committed fraud, breached his obligations pursuant to a constructive trust, and that Danzik stole the CWT Parties' funds. Danzik may not re-litigate issues that the New York Court already adjudicated. The Judgment is non-dischargeable as a matter of law under Sections 523(a)(2) and (a)(6).

Debtor then filed this voluntary Chapter 7 petition.

After Debtor filed this Chapter 7 case, he filed a motion to extend the automatic stay. The court found, "Debtor did not provide clear and convincing evidence he filed his Chapter 7 case in good faith to extend the stay. The court finds Debtor's allegations in the Motion are not supported by the testimony and evidence nor do they consider the impact on all creditors."[17]

The CWT Parties did not present any witness or exhibits, but relied on briefs, the Section 707(a) factors; and Debtor's bankruptcy history. Debtor presented testimony from Anthony Ker, a business relation of eight to nine years; Bill Hinz, Inductance Energy, Chairman and CEO (a former employer);[18] and Mr. Danzik. Debtor submitted one exhibit.

**Analysis**

The CWT Parties request the court dismiss Debtor's Chapter 7 bankruptcy case as 1) Debtor filed the case in bad faith and without proper purpose; and 2) *res judicata* bars his filing. Additionally, the CWT Parties seek dismissal with prejudice barring Debtor from refiling a bankruptcy case for 180 days.

Determining whether cause exists to dismiss a case under Section 707(a) lies within the sound discretion of the court.[19] The Code does not define cause, but courts considering dismissal agree that it at a minimum requires Debtor's creditors not be prejudiced.[20] They also have broad authority to determine what constitutes "cause" to dismiss a Chapter 7 case.[21] Bankruptcy courts should not use "bad faith" as "a loose cannon which is to be pointed in the direction of a debtor

---

[17] DE 69, p. 10 (Bankr. D. Wyo. May 31, 2019).

[18] Mr. Danzik testified he works for Inductance but has not received a pay check since mid-January, as he "does not want to be a burden." Debtor's Schedule I indicates he is employed by Sulfur Creek Holdings, LLC from July 2018 to present, with a gross monthly income of $50,000.00, but is "currently in contract suspense."

[19] *In re McGuire-Pike*, No. 14-13365 ta7, 2015 WL 4181019, at *4–5 (Bankr. D.N.M. 2015) (citing *Gilboy v. Reukema* 610 Fed. Appx. 17 (2d. Cir. 2015)).

[20] *In re Asset Resolution Corp.*, 552 B.R. 856, 862 (Bankr. D. Kan. 2016).

[21] *In re Krueger*, 812 F.3d 365 (5th Cir. 2016) (citing 11 U.S.C.A. § 707(a)).

whose values do not coincide precisely with those of the court."[22] Dismissal for bad faith is appropriate when there is a clear record of a debtor's delay and contumacious conduct.[23]

### A. Burden of Proof

The burden of proof is upon the moving party to show cause for dismissal of this case by a preponderance of the evidence.[24] When a party questions Debtor's good faith in filing for bankruptcy protection and has met the burden of showing cause for dismissal, the burden shifts to Debtor to prove good faith.[25]

### B. Section 707(a)

The Bankruptcy Code provides:

> The court may dismiss a case under the chapter only after notice and a hearing and only for cause, including –
>
> (1) unreasonable delay by the debtor that is prejudicial to creditors;
>
> (2) nonpayment of any fees or charges required under chapter 123 of title 28; and
>
> (3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521(a), but only on a motion by the United States trustee. . . .[26]

The enumerated grounds for a "for cause" are illustrative rather than exhaustive, but courts are not in agreement as to whether these enumerated grounds allow "bad faith" as cause for dismissal.[27] The Tenth Circuit has not addressed whether a court can dismiss a Chapter 7 case on bad faith grounds. Bankruptcy courts within the Tenth Circuit and other Circuits have and held even though bad faith is not an enumerated factor constituting "cause" for dismissal under Section 707(a), evidence of a debtor's "bad faith" in filing a Chapter 7 case is cause for dismissal. [28] Another recognized non-enumerated ground for dismissal under Section 707(a) is

---

[22] *In re McGuire-Pike*, 2015 WL 4181019, at *4–5 (citing *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994) (quoting *Sinkow v. Latimer* (*In re Latimer*), 82 B.R. 354, 364 (Bankr. E.D. Pa. 1988)).

[23] *In re Martin-Trigona*, 35 B.R. 596, 601 (Bankr. S.D.N.Y. 1983).

[24] *In re Bushyhead*, 525 B.R. 136, 137 (Bankr. N.D. Okla. 2015).

[25] *In re Lombardo*, 370 B.R. 506, 513 (Bankr. E.D.N.Y. 2007).

[26] Section 707(a).

[27] *In re Bushyhead*, 525 B.R. at 142.

[28] *See In re Asset Resolution Corp.*, 552 B.R. at 863; *In re Bushyhead*, 525 B.R. at 146; *In re McGuire-Pike*, 2015 WL 4181019, at *8; *In re Zick*, 931 F.2d 1124, 1126 (6th Cir.1991); *Perlin v. Hitachi Capital Am. Corp.*, 497 F.3d 364, 369 (3d Cir. 2007).

lack of a legitimate bankruptcy purpose.[29] Although not controlling, the cases appear persuasive
to this court's analysis.

To determine whether a debtor filed a chapter 7 case in bad faith, courts review the
totality of the circumstances.[30] Debtor's pre-petition conduct, including his past bankruptcy
filings, is relevant to the court's good faith analysis.[31] Each debtor's circumstances are unique,
and the proper weight to give each fact necessarily depends on all the other facts presented.[32]
The Bankruptcy Court for the Northern District of Oklahoma relied upon the Eleventh Circuit
which characterized the totality of the circumstances test for bad faith under Section 707(a) as:

> The totality-of-the-circumstances inquiry looks for atypical conduct, that falls
> short of the honest and forthright invocation of the [Bankruptcy] Code's
> protections. In making that determination, bankruptcy courts must, as they so
> often do, sift the circumstances surrounding [a] claim to see that injustice or
> unfairness is not done. Under this inquiry, bad faith ultimately evidenced by the
> debtor's deliberate acts or omissions that constitute a misuse or abuse of the
> provisions, purpose, or spirit of the Bankruptcy Code.[33]

Bankruptcy courts have identified sixteen factors to consider in the totality-of-the-circumstances
analysis: 1) whether Debtor's manipulations (if any) had the effect of frustrating one particular
creditor; 2) the absence of an attempt to pay creditors; 3) Debtor's failure to make significant
lifestyle changes; 4) whether Debtor has sufficient resources to pay a substantial portion of debts;
5) whether Debtor inflated expenses to disguise financial well-being; 6) whether Debtor is
overutilizing protections of the Bankruptcy Code to the conscious detriment of creditors; 7)
whether Debtor reduced his creditors to a single creditor in the months prior to filing his petition;
8) whether Debtor failed to make lifestyle adjustments or continued living an expansive or lavish
lifestyle; 9) whether Debtor filed the case in response to a judgment in pending litigation; 10) the
unfairness of using Chapter 7; 11) whether Debtor is paying debts to insiders; 12) whether
Debtor transferred assets; 13) whether Debtor employed a deliberate and persistent pattern of

---

[29] *In re Asset Resolution Corp.*, 552 B.R. at 862-63; s*ee also Asociación de Titulares de Condominio Castillo*, 581
B.R. 346, 357–58 (B.A.P. 1st Cir. 2018); *Kelley v. Cypress Fin. Trading Co.* (*In re Cypress Fin. Trading Co.*)*,*
620 Fed.Appx. 287, 289 (5th Cir. 2015); *M.P. Constr. Co. v. Wong* (*In re M.P. Constr. Co.*)*,* No. CC–12–1306–
DKiPa, 2013 WL 829117, at *5 (B.A.P. 9th Cir. Mar. 4, 2013).

[30] *In re Quinn*, 490 B.R. 607, 618 (Bankr. D.N.M. 2012)*.*

[31] *In re Brown*, 399 B.R. 162, 169 (Bankr. W.D. Va. 2009).

[32] *In re Kane & Kane*, 406 B.R. 163, 167 (Bankr. S.D. Fla. 2009).

[33] *In re Bushyhead*, 525 B.R. 136, 146 (Bankr. N.D. Okla. 2015) (internal quotation marks and citations omitted)
(emphasis added) (alterations in original).

evading a single major creditor; 14) whether Debtor failed to make candid and full disclosure;

15) whether the debts are modest in relation to assets and income; and 16) whether there are

multiple bankruptcy filings or other procedural gymnastics.[34]

  The CWT Parties rely upon Nos. 1, 2, 6, 9, 13, and 16.

  Factor 1. *Whether Debtor's manipulations (if any) had the effect of frustrating one*
      *particular creditor*

  Debtor filed the First Case during the pendency of contempt proceedings in the New

York court against Debtor in favor of the CWT Parties. The CWT Parties pursued Debtor

throughout his bankruptcy cases, here and in Arizona.[35] Debtor filed his Second Case shortly

after the CWT Parties took steps to enforce the contempt order. Debtor filed Chapter 7 after the

CWT Parties attempted to collect on its judgment. Debtor's manipulation frustrated the CWT

Parties. This factor weighs in favor of the CWT Parties.

  Factor 2. *The absence of an attempt to pay creditors*

  Throughout Debtor's bankruptcy filings in Wyoming, he failed to get a plan confirmed in

the First Case. He chose to "opt-out" of presenting a plan in the Second Case. During the entire

time Debtor was a Chapter 11 Debtor-in-possession, creditors did not receive any payment.

Debtor has not attempted to pay the Internal Revenue Service, CWT Parties or other secured or

unsecured creditors. This factor weighs in favor of the CWT Parties.

  Factor 6. *Whether Debtor is overutilizing protections of the Bankruptcy Code to the*
      *conscious detriment of creditors*

  Throughout the pendency of Debtor's chapter 11 cases, he enjoyed the benefits of the

Code's automatic stay. During this time his actions were a detriment to creditors, as none

received payments on their claims for at least 41 months. In dismissing the Second Case, the

court explained: "Debtor's circumstances have not changed. The CWT litigation continues, and

---

[34] *In re McGuire-Pike*, No. 14-13365 ta7, 2015 WL 4181019, at *5-6 (Bankr. D.N.M. July 10, 2015) (citing *In re Lombardo*, 370 B.R. 506, 512 (Bankr.E.D.N.Y.2007) (listing 14 of the factors); *In re O'Brien*, 328 B.R. 669, 675 (Bankr. W.D.N.Y. 2005) (same); *In re Quinn*, 490 B.R. at 618 (listing all 16 factors but emphasizing the first six); *In re Baird*, 456 B.R. 112, 116–17 (Bankr. M.D. Fla. 2010) (listing 15 factors)).

[35] *In re RDX Technologies Corporation*, *Order Dismissing Bankruptcy Case*, Case No.; 2:15-bk-15859, Doc. 143 (Bankr. D. Ariz. May 23, 2016) (Dismissed and barred from refiling for 180 days, "for the reasons set form on the record." *In re RDX Technologies Corporation*, *Order Dismissing Chapter 11 Case*, Case No. 2:17-bk14387-PS, Doc 143 (Bankr. Ariz. November 29, 2018) (Dismissed by stipulation amongst the parties. Debtor not allowed to file bankruptcy for 180 days.).

Creditors' claims are on hold while Debtor parks in bankruptcy."[36] Additionally, even now, Debtor consciously opposes the CWT Parties' collection efforts outside of bankruptcy after the court dismissed the Second Case. This factor weighs in favor of the CWT Parties.

Factor 9. *Whether Debtor filed the case in response to a judgment in pending litigation*

Debtor filed the First Case in response to a judgment entered against him and in favor of the CWT Parties. In addition, Debtor's bankruptcy filing halted the litigation of Sigma Opportunity Fund II, LLC's action against Debtor in the Supreme Court of the State of New York. That Court signed a default summary judgment on January 12, 2016 and awarded Sigma $2,340,800.00 in damages, plus interest. However, before the order was entered, Debtor filed his First Case. As Debtor did not inform the New York Court of his bankruptcy, Sigma filed a notice with the New York Court regarding Debtor's First Case. Thereafter, Sigma sought relief from the automatic stay, to have judgment entered. This factor weighs in favor of the CWT Parties.

Factor 13. *Whether Debtor employed a deliberate and persistent pattern of evading a single major creditor*

As stated above, Debtor employed a deliberate and persistent pattern of evading the CWT Parties. The CWT Parties' debt represents almost one-third of all Debtor's debt. This factor weighs in favor of the CWT Parties.

Factor 16. *Whether there are multiple bankruptcy filings or other procedural gymnastics*

Debtor filed three bankruptcy cases in the District of Wyoming and one in the District of Arizona in the past three and one-half years. Debtor's actions considered procedural gymnastics include failure get a plan approved in the First Case; failure to file monthly operating reports so the court and creditors would not know his current financial status; "opting out" of filing a plan in the Second Case; the need for creditors to file multiple adversaries and request for relief from the stay; lack of good faith in filing and administering the previous cases; and opening a second bank account for the purpose of saving funds to pay the IRS tax liability despite failing to resolve his tax liability. Debtor has multiple filings and procedural stalling to enjoy the benefits of the automatic stay but failed to perform his duties. This factor weighs in favor of the CWT Parties.

All factors the CWT Parties rely on support dismissal.

---

[36] *Decision Memorandum on CWT's Motion to Dismiss, In re Danzik*, Bankr. Case. No. 17-20934, Doc. 201, p. 12 (Bankr. D. Wyo. February 6, 2019).

**111**

The court finds other factors also support dismissal. First, factor 10 – the unfairness of using Chapter 7. Debtor had two Chapter 11 cases dismissed and never asserted conversion in the creditors' and the estate's best interest, but shortly thereafter filed this Chapter 7 case. After filing the Chapter 7 case, the court denied Debtor's request to extend the stay finding it is unfair to creditors to allow Debtor to use Chapter 7 to make an end run around the court's previous orders of dismissal. This factor weighs in favor of the CWT Parties. Second, factor 12 – whether Debtor transferred assets. The New York court found Mr. Danzik improperly converted tax credits. Mr. Hinz confirmed these credits were used in the operations of RDX Technologies.

Third, factor 14 – whether Debtor failed to make candid and full disclosure. The court is concerned about Debtor's veracity disclosing information.  For example, Debtor's assets in the Chapter 11 cases are valued greater than the same assets in his Chapter 7.

| Description | Chapter 11 values | Chapter 7 value |
|---|---|---|
| Bentley Arnage | $76,300.00 | $35,000.00[37] |
| GMC Arcadia | $18,500.00 | |
| KTM 690 Enduro | $5,500.00 | $4,500.00 |
| Jaguar | $9,000.00[38] | |
| 2011 "Huckabee" signed by Behinger Electric Guitar | $6,500.00[39] | |
| 2011 Crestwood "CMA" signed Acoustic | $2,200.00 | $1,200.00 |
| 1977 Lincoln Continental Batmobile-case 003 | $250,000.00 | $250,000.00 |
| 1989 Chevrolet Caprice Batmobile-car 004 | $185,000.00 | $185,000.00[40] |
| 1974 Ford Torino | $34,000.00 | $24,000.00[41] |

---

[37] A Motion for Relief is pending, filed by TD Auto Finance, LLC, ECF No. 24.

[38] The GMC Arcadia nor the Jaguar are listed on the Chapter 7 schedules, nor does the Statement of Financial Affairs reflect transfers.

[39] This is not listed on the Chapter 7 Schedule A/B, nor does Debtor disclose a transfer or sale on his Statement of Financial Affairs.

[40] Mr. Danzik testified the "bat mobiles" are valued at $1 million.

[41] Mr. Danzik testified Biltmore loan was paid. The court notes Creditor was granted stay relief. Case No. 16-20002, ECF No. 384. It appears this creditor may have been paid during the Second Case, without court's knowledge or approval.

Debtor testified, or counsel informed the court, throughout the cases Debtor filed multiple Federal income tax returns. However, even as late as the hearing on this matter, the IRS' Proof of Claim reflects estimated tax liabilities for 2016, 2017 and 2018 tax years for failure to file a return or provide necessary documentation. The inconsistencies and failure to fully disclose leave the court wondering if the assets were overvalued in the Chapter 11, now under-valued in the Chapter 7 or improperly transferred. This factor weighs in favor of the CWT Parties.

The court finds factors 4 and 15– income and resources in relation to debt favor Debtor. The majority value of Debtor's listed assets are tied up in promissory notes RDX Technologies owes to Debtor and the potential recovery under a lawsuit in Canada. However, recovery of these assets is speculative and without success, Debtor will not be able to pay a substantial portion of his debts given the large judgments against him. Debtor did not reduce his creditors to a single creditor in the months prior to filing his petition so factor 7 also weighs in his favor.

The court is without enough information or does not find the other factors apply: factor 3 – Debtor's failure to make significant lifestyle changes; factor 5 – whether Debtor inflated expenses to disguise financial well-being; factor 8 – whether Debtor failed to make lifestyle adjustments or continued living an expansive or lavish lifestyle; factor 11 – whether Debtor is paying debts to insiders.

The court's analysis demonstrates the majority of the factors weigh in favor of the CWT Parties. Under the totality of the circumstances, described above, the court finds CWT Parties met its burden proving cause to dismiss the Chapter 7 case for bad faith. The burden shifts to Debtor to prove good faith.

Debtor responds the bankruptcy court does not have the ability to dismiss a chapter 7 case for lack of good faith. The court disagrees, as explained above.

Debtor testified the ability to obtain a "fresh start," the benefit of the discharge is among the many purposes for chapter 7 relief, and the desire to have an orderly distribution of assets without one opportunistic creditor "grabbing the whole apple cart" show his good faith. Based on Debtor and CWT Parties' history, that "one opportunistic creditor" refers to the CWT Parties and their actions of serving an Injunctive Notice on Debtor's bank where Debtor maintained the tax and DIP accounts. It is no surprise Debtor seeks a discharge. Aside, from the CWT Parties non-dischargeable debt, Debtor potentially seeks to discharge a significant amount of unsecured debt.

Additionally, the realistic results of his chapter 7 is to only pay the Internal Revenue Service tax liability.

C. <u>Res judicata</u>

The court having found cause to dismiss Debtor's Chapter 7 case, will not address this issue.

D. <u>Dismissal with prejudice</u>

The CWT Parties request the court dismiss Debtor's Chapter 7 bankruptcy case with prejudice. The dismissal of a case " 'for cause' does not *ipso facto* bar future filings."[42] Section 349(a) provides:

> Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in Section 109(g) of this title.

Section 109(g) provides:

> [N]o individual or family farmer may be a debtor under this title who has been a debtor in a case pending under this title at any time in the preceding 180 days if—
>
> (1)     the case was dismissed by the court for willful failure of the debtor to abide by orders of the court, or to appear before the court in proper prosecution of the case; or
>
> (2)     the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay provided by section 362 of this title.

1. *180-day bar*

The Tenth Circuit determined "in order to dismiss a case with prejudice to refiling, the Court is limited to the provisions contained in 11 U.S.C. § 109(g), finding a bankruptcy court may not deny future access to bankruptcy courts for more than 180 days."[43] As the CWT Parties request a 180-day bar to Debtor's ability to refile, this is not an issue.

2. *With prejudice*

The court having determined Debtor's conduct is sufficient, under the totality of the circumstances to dismiss the case, it must now determine whether "with prejudice" is the

---

[42] *In re Casse*, 196 F.3d 327, 335 (2nd Cir. 1999).
[43] *Frieouf v. United States* (*In re Frieouf* ), 938 F.2d 1099, 1103-4 (10th Cir. 1991)).

appropriate sanction. There are two possible sanctions the court can apply. Section 109(g) determines whether Debtor may access the bankruptcy court in the future; whereas Section 349(a) determines whether Debtor will be entitled to discharge certain debts in future cases. The CWT Parties ask this court to dismiss with prejudice to prevent Debtor from filing another petition within 180 days, so the court need not address the alternative. The CWT Parties do not reference Section 105, but courts within the Tenth Circuit hold a court may not use Section 105 to extend its authority to dismiss with prejudice unless the requirements of Section 349 and 109 are used.[44]

Under Section 109(g), the court may determine Debtor is ineligible for bankruptcy relief for a period of 180 days if he: 1) willfully violated a court order; 2) failed to prosecute a case; or 3) voluntarily dismissed the case after a creditor has filed a motion for relief from stay. "Dismissal with a bar to refiling is an extreme remedy to be invoked with caution and restraint."[45] An injunction against future filings acts as dismissal of a case before one is filed. Because Debtor's creditors and financial circumstances may change from time-to-time, barring future filings prevents him from restructuring or discharging debts not affected by a prior case's bad faith.

The Tenth Circuit concluded: "[A] bankruptcy court may not deny future access to bankruptcy court, except under the circumstances of section 109(g)."[46] Courts within the Tenth Circuit are split on the interpretation of the *Frieouf* case. Some courts find bad faith does not fall within the Section 109(g) constraints.[47] "There is no reference in § 109(g) to repetitive filings or dismissal under circumstances of bad faith."[48] Others find a court can condition new petitions when: (1) a debtor demonstrated bad faith or defiance, and (2) when a debtor's conduct was abusive or prejudicial to creditors.[49]

---

[44] *In re Gray*, No. 13-09-14275 JA., 2009 WL 3849710, at *2 (Bankr. D.N.M. 2009); *In re Merrill*, 192 B.R. 245, 252 (Bankr. D. Colo. 1995).

[45] *In re Merrill*, 192 B.R. at 252.

[46] *In re Frieouf*, 938 F.2d 1099, 1103 (10th Cir. 1991).

[47] *In re Gray*, No. 2009 WL 3849710, at *2; *In re Merrill*, 192 B.R. at 252.

[48] *In re Merrill*, 192 B.R. at 252.

[49] *In re Norton*, 319 B.R. 671, 681 (Bankr. D. Utah 2005); *In re Guebert*, No. 07-41165, 2008 WL 1744777, at *8 (Bankr. D. Kan. Apr. 11, 2008); *In re Hancock*, No. 15-10037-JDL, 2015 WL 1292387, at *6 (Bankr. W.D. Okla. Mar. 19, 2015).

Successive filings do not necessarily constitute defiant conduct, but multiple filings may be evidence of such when a debtor continually fails to actively prosecute her bankruptcy cases.[50] Debtor filed a plan the court would not confirm after being in bankruptcy for 14 months. In his Second Case, he "opted out" of filing a plan and remained in bankruptcy another 14 months until the court dismissed it. During this time, Debtor did not, and still has not, resolved his IRS tax liability, which will only delay this case further.[51] He exacerbated this by not paying most if not all creditors since he filed the First Case.

A debtor prejudices a creditor when, through repeated filings, denies the creditor the opportunity to exercise its remedies because of the automatic stay.[52] "Abusive serial filing not only denies the creditor certain rights, it allows a 'rapacious' debtor to use the automatic stay as a sword against its creditor: this is not the purpose of § 362."[53]

When considering possible sanctions, courts are mindful to impose the least onerous sanction to remedy the prejudice, punish the past wrongdoing, and/or deter future wrongdoing.[54] Debtor has not changed his conduct since he filed his First Case over three and one-half years ago. Despite this court's findings on at least two occasions that Chapter 7 was not in the best interest of creditors, Debtor filed this Chapter 7 case where again the parties are in limbo with no movement on this case. This dismissal has no meaning if he can simply re-file the very next day or month without any meaningful change in circumstances.

The court sides with those cases finding a debtor's bad faith conduct warrant a filing injunction when a debtor's conduct is defiant and prejudicial to creditors or abusive. Debtor has manipulated the bankruptcy system and used it as his own personal shield from creditors' collection efforts. Debtor's conduct is sufficiently evasive, defiant, and abusive to dismiss the case with prejudice.

## CONCLUSION

The court finds Debtor filed his Chapter 7 in bad faith. The CWT Parties met their burden. Debtor did not overcome that by showing he filed in good faith. The dismissal will not

---

[50] *In re* Norton, 319 B.R. at 683.
[51] Debtor has been in Chapter 7 for over three months and still has not been able to conclude his 341 meeting.
[52] *In re Norton*, 319 B.R. at 683–84.
[53] *Id.*
[54] *In re Krause*, 367 B.R. 740 (Bankr. D. Kan. 2007).

**116**

prejudice creditors. Debtor's case shall be dismissed for cause. Debtor shall not file another petition in any jurisdiction within 180 days of this Order.

The court expressly determines this decision memorandum is the findings and conclusions, pursuant to Fed. R. Bankr. P. 7052, and Fed. R. Civil P. 52. A judgment based on this ruling will be entered by separate document as required by Fed. R. Bankr. P. 7058 and Fed. R. Civ. P. 58(a).

BY THE COURT

6/24/2019

_____
Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming

Service:
      Bradley T. Hunsicker
      Jeffrey M. Eilender
      Ken McCartney
      Dennis Wilenchik

**117**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

In re                                    )
                                         )
DENNIS MEYER DANZIK                      )     Case No.  19-20116
                                         )        Chapter 7
                        Debtor.          )

## JUDGMENT

THIS MATTER is before the court on the Motion to Dismiss Chapter 7 Case, with
prejudice filed by Creditors CWT Canada II Limited Partnership and Resource Recovery
Corporation (CWT Parties). The court finds for Creditors CWT Parties pursuant to the
Memorandum Decision, filed herein.

IT IS ORDERED Debtor's Chapter 7 bankruptcy case is dismissed, with prejudice;

IT IS ORDERED Debtor is barred from filing a bankruptcy case in the District of
Wyoming for 180 days from the entry of this judgment; and

IT IS FINALLY ORDERED this is a final order pursuant to Fed. R. Civ. P. 54, made
applicable under Fed. R. Bankr. P. 7054.

BY THE COURT

6/24/2019

Honorable Cathleen D. Parker
United States Bankruptcy Court
District of Wyoming

Service:
    Bradley T. Hunsicker
    Jeffrey M. Eilender
    Ken McCartney
    Dennis Wilenchik

**118**